**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ROBERT EDWARDS,　　　　　　　　　:
CURTIS BUTTS,　　　　　　　　　　:
TIMOTHY MYERS, JR,　　　　　　　:　　　　Civil Action No.  23-1789
TROY JONES,　　　　　　　　　　　:
GREGORY MEGGINSON,　　　　　　:
JAMES SKINNER,　　　　　　　　　:
AUSTIN PRINCE,　　　　　　　　　:
JAMES ROBINSON, and　　　　　　　:
HERBERT L. ROBINSON,　　　　　　:
Individually and on behalf of　　　　　:
Others similarly situated,　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　Plaintiffs,　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
JBS Souderton, Inc.,　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　Defendant.　　　　　　　:

## FIRST AMENDED COMPLAINT

1.  This is a class action brought under 42 U.S.C. § 1981 (a), to redress Defendant's pattern and practice of practices on the basis of race which Plaintiffs allege are unlawful employment practices under the law.  The statute, 42 U.S.C. §1981 had its genesis in the Civil Rights Act of 1866., prohibiting discrimination because of race.

2.  Defendant, through its employees, servants, and agents, including the most senior management, acted to intentionally discriminate against Plaintiffs, as Black/African Americans concerning the conditions or employment.

3.  Plaintiffs have alleged that they were denied conditions, or privileges of employment, including recruiting and hiring, deciding who to promote and transfer, assigning work, measuring performance, providing benefits, and disciplining or firing.

4.  Defendant denied employment to Plaintiffs and other Black/African Americans similarly situated because of their race.

5.  Defendant's denial of employment to African Americans was intentional discrimination based on Plaintiffs' race; created injury to dignity, feelings, and self-respect.

6.  Defendant operates an arbitrary system of racial bias in their hiring, rehiring, and promoting processes by advancing Black Immigrants and other ethnic minority groups as a criterion to camouflage discrimination against hiring Black/African Americans.

7.  Plaintiffs claim that they were denied pay raises; were not allowed to advance to other higher paying positions and; denied equal opportunity to be a part of JBS management team.

8.  As a matter of practice and custom JBS Souderton Inc. has failed to hire, rehire, promote Black/African Americans.

9.  JBS managers and employees freely use the term "nigger" to address Black employees, along with other racial slurs.

10. Plaintiffs allege that they were treated differently in the workplace due to their protected class status.

11. JBS actively discriminates against Plaintiffs and other Black/African Americans in the workplace and in the hiring/rehiring process having no equal opportunity to employment.

12. Defendant when it came to the hiring, rehiring, and promotion of Black/African Americans they use as a matter of policy and custom, race-based discriminatory hiring practices to discriminate against the Class.

13. Black/African Americans are passed over for promotions in favor of Black immigrants and other minority ethnic groups.

14. Black/African Americans are disciplined and terminated more readily than other similar situated JBS employees.

15. Defendant denied Plaintiffs the opportunity to be rehired or to finish their careers with JBS, denying them salaries/wages, bonuses and employer's medical plan as awarded to similarly situated returning employees.

16. Souderton employment ratio of hiring or the promotion of Black/African Americans is consistent with its policy and practice to intentionally discriminate against African Americans.

17. Entities related to defendant – i.e. other JBS entities – have contracts and agreements with government agencies which requires the maintenance of hiring statistics. (Exhibits A and B), thus, upon information and belief, Defendant also has contracts and agreements with government agencies which requires the maintenance of hiring statistics, and/or abides by its related entities' agreements.

18. Defendant knew or should have known of the unlawful policies and practices and need for immediate remediation as a result of various lawsuits which have been brought relating to the parent company policies and practices to discriminate against African Americans and others at its facilities throughout the country. (Exhibits A and B)

19. Defendant failed to investigate and remediate what it knew or should have known was a

work environment permeated by racial animus.

20. For four years prior to the filing of the Complaint in this matter, and preceding in time as a continuing violation, Defendant's Souderton facility has been permeated by racial animus against African Americans including permission to harass and intimidate them. Defendant, as relates to the Souderton facility failed to

   a. have reasonable anti-discriminatory policies which would have prohibited open racial animosity to persist;

   b. failed to have policies and practices to address known and open racial animus;

   c. failed to have policies and practices to address complaints concerning racial animus;

   d. failed to have policies and practices to effectively investigate complaints of racial animus;

   e. failed to have policies and practices to effectively remediate complaints of racial animus.

21. Plaintiffs contend that statistical evidence to be obtained through discovery will demonstrate intentional discrimination in hiring; pay; promotion and termination which alone, or with additional evidence, will demonstrate intentional discrimination. Plaintiffs are Typical of the Classes,  and will Adequately seek redress on behalf of the Class, because they were the subject of severe and pervasive racial animus, were paid inferior wages, were denied promotion, were precluded from being hired and were terminated. So, Plaintiffs ask this Court to certify classes under Fed. R. Civ. P. 23 (b)(2) and (3) for requested relief outlined below.

**JURISDICTION AND VENUE**

22. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, § 1337 and § 1343.  This action is authorized and instituted pursuant to Section 706 (f) (1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, Section 102 of the Civil Rights Act of 1991 and Section 1981 of the Civil Rights Act of 1866, as amended.

23. Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391, because the unlawful conduct alleged herein was committed and continues to occur within the boundaries of the Eastern District of Pennsylvania.

**INDIVIDUAL PLAINTIFFS**

24. Plaintiff, Robert Edwards, is a natural person and a former JBS Souderton employee residing at 1537 E. Comly Street, Philadelphia, Pennsylvania 19149. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

25. Plaintiff, Curtis J. Butts, Jr., is a natural person and a former JBS Souderton employee residing at 644 E. Ontario Street, Philadelphia, Pennsylvania 19134. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

26. Plaintiff, Timothy Myers, Jr., is a natural person and a former JBS Souderton employee residing at 1374 Edgewood Avenue, Abington, Pennsylvania 19134. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

27. Plaintiff, Troy Jones, is a natural person and a former JBS Souderton employee residing at 2341 North 20th Street, Pennsylvania 19132. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

28. Plaintiff, Gregory Megginson, is a natural person and a former JBS Souderton employee residing at 7012 Barnett Lane, Elkridge, Maryland 21075. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

29. Plaintiff, James Skinner, is a natural person and a former JBS Souderton employee residing at 5926 Bustleton Avenue, Philadelphia, Pennsylvania 19149. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

30. Plaintiff Austin Prince is an adult African American male and resident of Philadelphia County, Pennsylvania. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

31. Plaintiff, James Robinson, is a natural person and a former JBS Souderton employee residing at 190 Roselyn, Philadelphia, Pennsylvania 19120. Plaintiff is a Black/African American and is eligible for the protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

32. Plaintiff Herbert L. Robinson is a natural person and a former JBS employee who is eligible for protection under the Civil Rights Act of 1866, 42 U.S.C. §1981 as evidenced by his claim for purposeful discrimination.

## DEFENDANT

33. Defendant JBS Souderton, Inc., a division of JBS Regional Beef, was incorporated in Pennsylvania on May 8, 1946, under previous names Moyer Packing Company and Smithfield Beef Group Souderton, Inc., with principal offices at 249 Allentown Road, Souderton, PA 18964-2207.

34. Defendant, through its employees, servants, and agents, including the most senior management, acted to violate Plaintiffs' civil rights claiming intentional race discrimination under 42 U.S.C. Section 1981.

## CLASS DEFINITIONS

35. Plaintiffs seek to represent all similarly situated current or former African American employees and seek injunctive relief under Fed. R. Civ. Pro. 23 (b)(2) and/or satisfy the membership in any of the Fed. R. Civ. Pro. 23 (b)(3) classes enumerated:

a. All African Americans who worked in Defendant's Souderton facility and can attest to the use of racially offensive statements in their presence. The Class Period begins four years prior to the filing of the Complaint (May 15, 2019) and ends when the Defendant's completely remediate the effects of the unlawful work environment.  Plaintiffs on behalf of themselves and similarly situated employees claim that there was a continuing violation for Defendant's actions and inactions which preceded the statute of limitations.

b. All African Americans who sought employment with Defendant but who were **denied employment** on the basis of race. The Class Period begins four years prior to the filing of the Complaint (May 15, 2019) and ends  when the Defendant's completely remediate the effects of the unlawful work environment.

c. All African Americans whose *wages* were less than those outside the protected class because of their protected class status. The Class Period begins four years prior to the filing of the Complaint (May 15, 2019) and ends when the Defendant's completely remediate the effects of the unlawful work environment.

d. All African Americans who were denied **promotion** because of their  protected class. The Class Period begins four years prior to the filing of the Complaint (May 15, 2019) and ends when the Defendants' completely remediate the effects of the unlawful work environment.

e.  All African Americans who were **terminated** because of their protected class. The Class Period begins four years prior to the filing of the Complaint (May 15, 2019) and ends when the Defendants' completely remediate the effects of the unlawful work environment.

## CLASS ACTION ALLEGATIONS

36. Plaintiffs bring this action pursuant to Fed. R. Civ. Pro. 23 (b)(2) and (3) on behalf class of similarly situated employees and prospective employees who suffered and continue to suffer intentional discrimination in their employment because they are African American.

37. Plaintiff seeks to represent a class of similarly situated African Americans as described in the Class Definition above.

38.  This action is brought and may properly be maintained under Fed. R. Civ. Pro 23 (b)(2) because there is Numerosity, Commonality, Typicality and Adequacy.

39. Numerosity is satisfied because there have been more than forty and likely hundreds of JBS employees who meet a Class Definition.

40. Commonality is met through common questions of law and fact pertaining to JBS's employment policies and practices which if proven would resolve all or most of the issues the individuals would need to prove at trial including:

**I.  Hostile Work Environment**

a.  Does JBS have policies or practices which deny African-Americans a workplace which is free of unlawful discrimination based upon race?

b.  Was JBS's work environment permeated by offensive racial statements, references and directives such that the reasonable African American would deem the conditions

of employment were altered?

c. Was JBS's work environment permeated by offensive racial statements such that it was known to management and upper-management and can be established to be Defendant's policy?

d. Were JBS's policies and practices reasonably calculated to deter its employees from engaging in discrimination which the reasonable African American would find offensive?

e. Did Defendant fail to enforce its policies in a manner designed to prevent a hostile work environment against the Class?

f. Did upper management participate in the hostile work environment such that it was understood to be a corporate policy to discriminate against the Class.

g. Was Defendant on notice of the hostile work environment?

h. Did Defendant fail to take reasonable steps to end the hostile work environment including investigation and remedial measures?

**II. Discrimination in wages/promotion/hiring/termination.**

a. Is there statistical disparity in wages, promotion, hiring and/or termination?

b. Do the statistical disparities create an inference of intentional discrimination

c. Is there other evidence which supports the inference of intentional discrimination in wages, promotion, hiring and/or termination?

41. Typicality is met because Plaintiffs are African Americans employed at Souderton Facility during the Class Period and qualify for class membership in one or all of the potential classes. Plaintiffs suffered damages arising out of Defendant's course of conduct. The harms suffered by the Plaintiff are typical of the harms suffered by the class

members.

42. Adequacy is met because the representative Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  Plaintiffs have no interests that are adverse to the interests of the members of the class. Plaintiffs have retained counsel who have substantial experience and success in the prosecution of class action and civil rights litigation.  The named Plaintiffs are being represented by Gerald Williams, Esquire Christopher Markos, Esquire and Dylan Hastings, Esquire of the Williams Cedar law firm and William Riback, Esquire who is a solo practitioner. Plaintiffs' counsel have the resources, expertise and experience to successfully prosecute this action.  Counsel knows of no conflicts among members of the class, or between counsel and members of the class.

43. Plaintiffs seek class certification under F.R.C.P. 23 (b)(2), to enjoin Defendant's unlawful conduct which continue to violate the law through the policies and practices as identified throughout this Complaint.  Defendant has been on notice of the need to remediate its failed policies but have taken no action.  (Exhibits A and B).  In short, Defendant has acted on grounds generally applicable to all class members.

44. In addition, Plaintiffs seek certification under F.R.C.P. 23 (b)(3).

45. Predominance is met because common questions of law and fact predominate over individual concerns particularly concerning Defendant's policies and practices, notice, statistics and other common proofs. The core issues relating to resolution of these common questions do not require individualized mini-trials. Further, resolution of these common issues will resolve most if not all aspects of liability the individual Plaintiffs must prove - making the class action Superior.

46. Superiority is met because a class action provides for the fair and efficient adjudication of this controversy, or the issues relating to the Classes' claims, since joinder of all of the individual members of the class is impracticable given the large number of class members and the fact that they are dispersed over a large geographical area.  Furthermore, the expense and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them.  The cost to the court system of adjudicating thousands of individual cases would be enormous.  Individualized litigation would also magnify the delay and expense to all parties and the court system. By contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the class.

47. Plaintiffs alternatively seek partial certification under Fed. R. Civ. P. 23.

## FACTUAL ALLEGATIONS OF THE CLASS

48. Defendant permitted and/or encouraged a work environment which it knew or should have known was permeated by a racially hostile environment which included common reference to African Americans as "n---", "my "n----", and Spanish variants of the same.

49. Defendant at all times relevant to the Complaint was on notice of the hostile work environment.

50. Defendant was on notice of the hostile work environment because:

   a. Defendant failed to have a reasonable anti-harassment policy.

   b. Management and upper management participated in making racially hostile statements;

   c. Management and upper management were present and acquiesced while others

made racially offensive statements;

d.  Management and upper management ignored complaints made by Plaintiffs and members of the absent class;

e.  Defendant segregated parts of its work force based upon race;

51. Throughout the Class Period, and prior as part of the continuing violation, employees at the Souderton facility complained about the hostile work environment.

52. African American employees at the Souderton facility complained of, or managers observed that, or managers participated in the severe and pervasive discrimination of African Americans including derogatory and offensive racial statements; providing African Americans with unfavorable work assignments; providing African Americans with inadequate tools and equipment, segregating the work environment and treating African Americans with less favorable treatment in the terms and conditions of employment.

53. Defendant deliberately failed to investigate and/or remediate the hostile work environment.

54. The Class claims that in addition to a hostile work environment, they suffered tangible adverse action based upon race as a result of Defendant's policies and practices including:

a.  failure to hire,

b.  failure to promote

c.  denial of equal pay because Defendant has a policy and practice to discriminate against African Americans and

d.  termination because of race

55. Upon information and belief, including the observations of Plaintiffs, the hiring, promotion, and pay statistics demonstrate that African Americans are treated least favorably as compared to those outside the protected class.

56. Upon information and belief, including the observations of Plaintiffs, the statistics and other evidence demonstrate that the statistical differences are based upon race.

57. Members of the Class have all suffered emotional distress and calculable damages which flow from adverse actions.

### **Robert Edward's Individual Claims**

58. Plaintiff was employed at JBS from 2011 through July 21, 2021.

**HOSTILE WORK ENVIRONMENT**

59. Throughout Plaintiff's employment he suffered a hostile work environment which Plaintiffs alleges is a continuing violation.

60. From May 15, 2019 until his severance from employment with Defendant, Plaintiff suffered a hostile work environment.

61. Plaintiff at that time was employed in management as a "Green Hat" "Export Superintendent" earning $78,000.00 per year.

62. During the Class Period, employees in the presence of management, and management, on a daily basis, used the "N" word conversationally in the presence of Plaintiff.

63. Ricky Figueroa, Superintendent, superior in rank to Plaintiff, routinely used the "N" word in the presence of Plaintiff. Plaintiff complained about Mr. Figueroa to his immediate supervisor concerning this.

64. Ephraim Rivera, Superintendent, during the Class Period, regularly referred to Plaintiff as "my N---".

65. Plaintiff repeatedly demanded that Ephraim Rivera , Superintendent, stop referring to him as "my N---".

66. Plaintiff often complained to Ami Thiam, QA Manager, but nothing was ever done to investigate or remediate Mr. Rivera's conduct.

67. The reason Ami Thiam, QA Manager, did not do anything is because JBS has a policy and/or pattern and practice of ignoring racial harassment of African Americans.

68. In 2020, Michael Cox, the facility's General Manager (most senior on-site management) in the presence of Plaintiff stated that his family in West Virginia would not permit a "black" through the front door.  A corporate representative from Colorado was present and heard this statement.  Plaintiff was offended and complained concerning senior managements' offensive statements.  Plaintiff also complained to Ami Thiam, QA Manager, but nothing was ever done to investigate or remediate Mr. Cox's statement.

69. The reason the statement was made and the reason Ami Thiam, QA Manager, did not do anything is because JBS has a policy and/or pattern and practice of ignoring racial harassment of African Americans.

**FAILURE TO PROMOTE**

70. In 2019, Plaintiff applied for QA Fabrication Superintendent which upon information and belief paid from $81,000.00-$110,000.00 per year.

71. Plaintiff was qualified for the position.

72. Plaintiff was denied the promotion because he is African American.

73. A less qualified white male was hired over Plaintiff because Plaintiff is African American.

74. In 2021, Plaintiff applied for QA Fabrication Superintendent which upon information and belief paid from $81,000.00-$110,000.00 per year.

75. Plaintiff was qualified for the position.

76. Plaintiff was denied the promotion because he is African American.

77. A less qualified white female was hired over Plaintiff because Plaintiff is African American.

## **FAILURE TO HIRE**

78. Plaintiff voluntarily left his employment July 2021.

79. JBS has a policy and practice to re-hire their former employees when they leave in good standing.

80. Plaintiff left his employment in good standing.

81. On or about October 2022, Plaintiff Edwards applied on-line for the open position, his old position as Export Superintendent, and was arbitrarily denied without an interview, because he was Black/African American and not of native African or Hispanic descent.

82. Consistent with Defendant's policy and practice to discriminate against African Americans, Defendant employs hiring managers or recruiters of Hispanic or Haitian races concentrate on hiring only those of their own race.

83. Consistent with Defendant's policy and practice to discriminate against African Americans, Oumou "Ami" Thiam hires FSQA managers and the employees are majority of native African descent; Senegal, Congo, Algeria, and Nigerian.

84. On or about, September 2022, Plaintiff Edwards applied on-line for an open position as QA Fab Superintendent and was denied employment because of his race without an interview, and the position was awarded to a white female employee with less experience in quality beef fabrication processes.

85. In October 2022, Plaintiff applied for QA Fabrication Superintendent but was denied employment without an interview. Plaintiff was qualified for the position. A less qualified white female was hired instead of Plaintiff. The reason Plaintiff was denied employment was because he is African American.

86. In March 2023, Plaintiff applied for QA Export Superintendent, the position he held prior to his severing his employment, but was denied employment without an interview. Plaintiff was qualified for the position. A less qualified Spanish individual was hired instead of Plaintiff. The reason Plaintiff was denied employment is because he is African American.

**DISCRIMINATORY WAGES**

87. Plaintiff Edwards worked at JBS as the lowest paid and only Black/African American Superintendent until July 19, 2021, left to become a QA Manager at Thomas Foods International, USA. (TFI).

88. TFI offered Plaintiff Edwards an enhanced salary and he left JBS after given two weeks' notice and JBS failure to meet TFI's compensation package with a promotion to QA Fab Superintendent; leaving JBS in good standing.

**Curtis Butts's Individual Claims**

89. Plaintiff was employed at Defendant from 2014 through November 2020.

90. From May 15, 2019 through his severance from employment, Plaintiff was employed in the QA Department as a Food Safety person.

**DISCRIMINATORY WAGES**

91. Of the six or seven Food Safety position employees from May 15, 2019, African Americans were disproportionately underrepresented.

92. Plaintiff was paid about $20.00 per hour while other employees outside the protected class in the same position were paid more.

93. Plaintiff was paid less because he is black.

## HOSTILE WORK ENVIRONMENT

94. From May 15, 2019 through his severance from employment, experienced a hostile work environment based upon race.

95. On a daily basis, both before and after May 15, 2019  Plaintiff heard or was referred to as a N--- by employees including management.

96. Plaintiff was aware that other similarly situated employees complained about the hostile work environment and nothing was done.

97. Plaintiff observed Ricky (Operations Manager) (Spanish) refer to his subordinates as N---.

98. After May 15, 2019, Plaintiff observed Herbert Robinson, Sr. (African American) being referred to as a N---- by management because he had food safety concerns and shut down the line.

99. In or around 2019, Plaintiff was disciplined for mislabeling a product along with Herbert Robinson, Sr., Ugo, Superintendent QA-Kill Floor (African national) who called Plaintiffs dumb "N---" in line with JBS's pattern and practice to dehumanize its employees based upon race.

## DEMOTION BASED UPON RACE

100.      Plaintiff Butts was demoted from Fab Supervisor to Quality Assurance (QA) Technician and replaced with a Hispanic female.

## DISCRIMINATORY WAGES

101.      Plaintiff Butts as a QA was denied pay raises for three years, while native

Africans received consistent annual pay raises.

**FAILURE TO PROMOTE**

102. In or about June 2019 Plaintiff sought a promotion to Kill Floor Supervisor ($24.00 per hour) through the company website. Plaintiff was interviewed for this position or about June 2019. Plaintiff was scheduled for a second interview in or about June 2019. Without any reason, Plaintiff was denied a second interview. The person who was hired for the promotion that Plaintiff sought was Caucasian. Plaintiff was not promoted based upon his protected class status.

**CONSTRUCTIVE DISCHARGE**

103. In or about December 2020, Plaintiff quit his employment at JBS because the conditions of employment were so hostile the reasonable African American would quit.

**FAILURE TO HIRE**

104. In or about November 2021, Plaintiff applied for employment at JBS on three occasions through the website listing open positions including QA Food Safety and Supervisor. Plaintiff was denied employment based upon his suspect class status.

**Timothy Myers, Jr. Individual Claims**

105. Plaintiff was employed from November 2016 through December 2019.

106. Plaintiff began his employment as a front pack off earning $11.15 per hour.

**FAILURE TO PROMOTE**

107. Plaintiff Myers, as a Q.A. was continuously denied over-time and the opportunity to advance beyond the N60 drilling area, while employees Rosendo, Bertine and Duniel, all Hispanic decent advanced to other higher paid areas.

108. Plaintiff Myers, as a Q.A. was continuously denied over-time and the

opportunity to advance beyond the N60 drilling area, while employees Rosendo, Bertine and Duniel, all Hispanic decent advanced to other higher paid areas.

## HOSTILE WORK ENVIRONMENT

109.    Plaintiffs Myers and Skinner worked were the only employees assigned to the N60 area which required 4-5 employees. Plaintiffs complained about the need to adequately staff this position to no avail.

110.    Plaintiff Myers, before starting was QA function, he worked in the Backpack-off area pushing bone carts that weighed over 600 pounds, when complained about this process was hurting his back, Superintendent Ramon stated, "fucking nigger stop complaining and do your job".

111. Plaintiff Myers, before starting was QA function, he worked in the Backpack-off area pushing bone carts that weighed over 600 pounds, when complained about this process was hurting his back, Superintendent Ramon stated, "fucking nigger stop complaining and do your job".

## HOSTILE WORK ENVIRONMENT – CONTINUING VIOLATION

112. In or about June 2017 Plaintiff complained to Howard (management) about Emilio (Supervisor) and Ramon (Lead – supervisory duties of co-employee) referring to him as N---.

113. Upon information and belief, there was no investigation or discipline of the employees.

114. In or about June 2017, as a result of the racial hostility and his complaint, Plaintiff was transferred to a new department N60 in QA earning more money.

115.The racial harassment continued when Plaintiff was transferred to this new department and

new position.

**SEGREGATION – HOSTILE WORK CLAIM – CONTINUING VIOLATION**

116. As part of the policy and practices to intentionally discriminate against African Americans, Defendant segregated the N60 QA trimming meat position filling it disproportionately with African Americans because it is the most arduous and least desirable position within QA and paid less than other positions of similar qualifications.

117.     After May 15, 2019, "Safety Joe" told Plaintiff "I cant stand you people" referring to African American employees.  Plaintiff complained to Amanda in Human Resources, but nothing was done.

118. JBS did not investigate the racial hostility.

119. From May 15, 2019 through his termination, Ephraim (Superintendent) Hugo (Supervisor) and Miguel (Supervisor) on a daily basis, used the N--- word including referring to Plaintiffs as N—such as "you N---.

120. Plaintiff complained to Ephraim about the casual used of the N word and that he was referring to Plaintiff as a N---.

121.     When Plaintiff complained to Ephraim he was told:  "N—go back to work".

122.The racial animosity from Ephraim (Superintendent) Hugo (Supervisor) and Miguel (Supervisor) on a daily basis was continuing upon his transfer in or about June 2017.

123. From May 15, 2019, until December 2020, sought transfer to a different less arduous position by verbally asking Ephraim (Superintendent) Hugo Miguel (Supervisor) and Ami to transfer to different higher paying positions.  Plaintiff was seeking transfer prior to May 15, 2019.  Plaintiff was told that he was needed in the N=60 position. Plaintiff was denied transfer based upon race.

## FAILURE TO HIRE

124. After leaving the company in good standing, Plaintiff applied for employment through the website.  In or about May 2020 Plaintiff applied for QA department.  Plaintiff was interviewed for the QA position.   Plaintiff was qualified for the position he sought.  Someone outside the protected class was hired.  Defendant did not hire Plaintiff based upon race.

125. Plaintiff applied for employment through the website.  Plaintiff applied for a position in the Maintenance Department. Plaintiff was not interviewed for this position.  Plaintiff was qualified for the position he sought. Someone outside the protected class was hired.  Defendant did not hire Plaintiff based upon race.

### Troy R. Jones Individual Claims

126.  Plaintiff was employed from June 2017 through January 2020.

## DENIAL OF OVER-TIME

127. Plaintiff Jones was denied over-time work while granting this opportunity to his Indian counterpart.

## TERMINATION BASED UPON RACE - RETALIATION

128. Plaintiff Jones was wrongfully terminated when he responded to a third-party employee's racial comments about doing his job.

## FAILURE TO PROMOTE – DISPARATE WAGES

129. From May 15, 2019 through January 2020, Plaintiff was in QA earning $19.50 per hour.

130. Prior to May 15, 2019, Plaintiff was complaining to Hugo, Superintendent (African) that Plaintiff was not advancing and not receiving pay raises.  Hugo told Plaintiff he is black and so he must wait his turn.

131. Plaintiff continued to complain about not receiving advancement and pay raises throughout his employment.

132. Plaintiff complained to Ami, HR and other about not receiving advancement and pay raises.

133. Plaintiff contends he should have been earning about $23.00 per hour but was denied based upon race. Other people who were earning more were not African American.

## DENIAL OF OVERTIME

134. Plaintiff was denied overtime based upon race.

## TERMINATION BASED UPON RAC*E*

135. Plaintiff was terminated December 2019, based upon race. Plaintiff was terminated for lateness. Other similarly situated employees were not terminated based upon lateness.

## FAILURE TO HIRE

136. Plaintiff applied for re-employment after he was terminated. Plaintiff applied on-line for QA and the Yard-Jockey position in 2021 but was denied based upon race. Plaintiff was qualified for the position. Plaintiff was not interviewed and heard nothing after making application. Someone outside the protected class was hired.

137. Plaintiff applied on-line for QA position in 2023 but was denied based upon race. Plaintiff was not interviewed and heard nothing after making application. Plaintiff was qualified for the position. Plaintiff was not interviewed and heard nothing after making application. Someone outside the protected class was hired.

## Gregory Megginson's Individual Claims

138.    Plaintiff Gregory Megginson was an employee of JBS from 2017 through March

2022.

139. In or around 2020, Plaintiff was promoted to General Foreman earning approximately $80,000.00 per year plus benefits.

## DISCRIMINATION IN WAGES

140. Out of all the General Foreman for that period of time, Mr. Megginson was the only African American General Foreman.

141. Other General Foreman across the board were receiving an additional 20% or more of their salary as bonuses.

142. Plaintiff was only receiving 15% as a bonus.

143. Plaintiff was denied bonuses because he is African American.

### James Skinner's Individual Claims

144.    Plaintiff James Skinner was an employee of JBS from 2012-2020.

145.    Plaintiff Skinner was not allowed to advance to other higher paying areas, while Hispanic employees were advancing to these opportunities.  Hispanics were re-hired after being terminated for attendance problems.

## HOSTILE WORK ENVIRONMENT – CONTINUING VIOLATION

146.    Plaintiff Skinner, complained about the Hispanic QA employees' referring to him in Spanish "Aqui' es donde trabajan los monos" (this is where the monkeys work).

147.      Plaintiff Skinner, complained to HR about managers referring to him as "nigger" and making jokes about Blacks.

148.    Throughout Plaintiff's employment the use of the N word was casually used in conversation on a daily basis by employees and management.

149.    The use of the N word was casually used in conversation by management including

Ephraim, "Coolay" (phoenetic) (QA Superintendent), Miguel (QA Supervisor), Hugo (Kill Floor Superintendent) and others. Mr. Skinner complained directly to them about their use of racist terms but nothing was done.

150.    After May 15, 2019, "Safety Joe" told Plaintiff "I cant stand you people" referring to African American employees. Plaintiff complained to Amanda in Human Resources, but nothing was done.

151.    Plaintiff complained to HR approximately ten times between 2019 and 2020 about the racially offensive statements being used by management but nothing was done.

152.    When Plaintiff complained to Ephraim he was told: "N—go back to work".

## DISCRIMINATORY WAGES

153.    Plaintiff Skinner from 2016-2020 worked in Quality Assurance ("QA") and held a position classified as N=60.

154.    Plaintiff Skinner began this position earning $19.00/hour.

155.     Plaintiff Skinner upon termination was earning approximately $21.75/hour as a Level II employee.

156.    Other similarly situated employees who had less seniority employed in QA outside the protected class earned more than Plaintiff.

157.    Plaintiff was denied equal pay based upon race.

## SEGREGATION-HOSTILE WORK ENVIRONMENT

158.    Plaintiff and similarly situated African American employees within QA were segregated into "drilling trim" based upon race.

159.    "Drilling Trim" is the most arduous position in QA.

160.    QA positions other than "drilling trim" were disproportionately held by individuals

outside the protected class.

161.    Plaintiff and other similarly situated African Americans who were N=60 assigned to "drilling trim" were paid less than similarly situated employees outside the protected class in QA who were assigned to job duties other than "Drilling Trim".

162.    Plaintiff Skinner sought other positions other than "drilling trim" because "drilling trim" is a less desirable position than other positions within QA and paid less.

163.    Plaintiffs and similarly situated employees within the protected class sought positions which would be less arduous but were denied based upon race.

164.    In or around 2017-2019, Plaintiff sought transfer to a less arduous position but his Supervisor Superintendent Ephraim advised Plaintiff he would not be transferred to another position.

165.    Plaintiff complained Ephraim, Miguel, Ami, Hugo and Amanda about being in a racially segregated position but was told that he would not be transferred.

**FAILURE TO PROMOTE**

166.    In 2019, Plaintiff applied for a position previously held by Robert Teller which was earning more money.  Ephraim told Plaintiff he would not be transferred from trim.

167.    In 2018, Plaintiff sought positions which paid less within Fabrication – "back pack off".  Darnell, was awarded the position.

168.    These positions were disproportionately held by employees outside the protected class.

169.    Plaintiff who was requesting a transfer was told to by Amanda quit his employment and re-apply after six months.

170.    JBS refused to transfer Plaintiff to a less arduous position because he is African

American.

171. Employees outside the protected class with less seniority were assigned to "Table Technicians" which pays slightly more and is a more desirable position because it only involves linear measurement of product.

## **TERMINATION BASED UPON RACE**

172. Plaintiff had a qualifying condition under the Family Medical Leave Act.

173. Plaintiff was denied FMLA based upon race resulting in termination based upon race.

### **Austin Prince's Individual Claims**

174. Austin Prince was employed at JBS from 2011 through August 2022.

## **HOSTILE WORK ENVIRONMENT – CONTINUING VIOLATION**

175. Throughout Plaintiff's employment, managers and co-workers routinely referred to Plaintiff as N-- or made general references in his presence to the same effect.

176. After May 15, 2019 Jose Fernandez (on floor supervisor) and Ricky Figueroa (Department Manager) routinely used the N—word, and referred to Plaintiff as a N---

177. Plaintiff complained to management including Jean on multiple occasions by going to his office.

178. Plaintiff also complained to his shop steward Safaai.

179. Defendant disregarded Plaintiff's complaints and allowed the hostile work environment to persist.

## **FAILURE TO PROMOTE**

180. In or about May 15, 2019 Plaintiff was employed as a forklift operator/stacker earning $17.50 per hour.

181.    In or about 2019, Plaintiff applied for Shipping Supervisor position through the JBS website which paid more than $60,000.00 per year.  Plaintiff was qualified for the position.

182.    Defendant hired a Caucasian who was not employed at JBS at the time of his hire.

183.    Plaintiff was denied this position based upon race.

184.    In or about 2021-2022, Plaintiff applied for Lead Person position in Chubbs Department earning $21.75 per hour.  Plaintiff was qualified for the promotion.

185.    Plaintiff was told that he was awarded the position and transferred to Chubb Department.

186.    Plaintiff was denied this position based upon race and because he was taking FMLA.

187.    Instead of giving Plaintiff the position, Defendant hired Joel a Latin-American into that position while Plaintiff worked within Chubb earning$17.50 per hour.

188.    Plaintiff applied for another Supervisor position in or about June 2022.

**TERMINATION BASED UPON RACE – FMLA (Mixed Motive)**

189.    Plaintiff was terminated based upon race/FMLA for the ostensible reason of lateness.  Prior to his termination, Defendant refused to give Plaintiff his vacation time based upon race which caused him to be assessed points.

190.    Plaintiff was called in for an interview for the Supervisor position he had previously applied for but was denied based upon him being terminated.

**James Robinson's Individual Claims**

191.  Plaintiff was employed at Defendant from 2018 through March 2023.

**Hostile Work Environment**

192. From May 15, 2019 until the end of his employment he was in the Barn Department working as a Shackler earning $16.00 per hour and upon his termination was earning

$27.00 per hour.

193. Upon information and belief, there were supposed to be three Shackler on the first shift but normally JBS had that position staffed with only two Shacklers requiring Plaintiff to have a higher rate of production than was expected.

194. The Shackler position was segregated with only African Americans. Plaintiff alleges he suffered wage discrimination through the segregation and requirement of over-production as did other African Americans in that position.

195. Plaintiff's bathroom breaks were delayed because of understaffing.

196. Plaintiffs' supervisors were exclusively Hispanic.

197. The Hispanic supervisors would refer to their employees in Spanish by a racial designation "moyo".

**Disparate wages**

198. Plaintiff was denied over-time when at the end of his shift there may have been ancillary work to do which could have been awarded to African Americans but was only offered to Hispanics.

199. Beginning in 2022, Plaintiff was promoted to Shooter in the Barn.

200. The Hispanic supervisors continued to refer to their employees in Spanish by a racial designation "moyo".

201. Plaintiff was denied over-time when at the end of his shift there may have been ancillary work to do which could have been awarded to African Americans but was more often offered to Hispanics.

**Adverse Action - Demotion**

202. Plaintiff was demoted for making an error in procedure causing the animal to suffer.

Plaintiff's co-worker had made several of the same errors with the knowledge of his supervisors but was not disciplined.

203. Plaintiff, earning the same wage, was demoted to "Pen Runner". The Pen Runner is an unsanitary and unsafe position of pushing the animal to slaughter.

204. Plaintiff reassumed the Shooter position after the U.S.D.A. gained knowledge that Plaintiff's co-worker had made the same error he was making in the presence of JBS Management.

205. The Hispanic supervisors continued to refer to their employees in Spanish by a racial designation "moyo".

206. Plaintiff was denied over-time when at the end of his shift there may have been ancillary work to do which could have been awarded to African Americans but was more often offered to Hispanics.

207. Plaintiff was transferred to Head Drop.

208. Plaintiff was under different supervisors who were predominantly Hispanic.

**Hostile Work Environment causing physical injury**

209. Plaintiff was retained in the Head Drop position for about six months without being switched out while other similarly situated employees who are outside the protected class were transferred to other positions. Plaintiff suffered a repetitive hand injury. Plaintiff formally sought worker's compensation but was denied through the employer's physician after Plaintiff's physician determined he had a repetitive hand injury. As a direct and proximate result of the discrimination Plaintiff suffered continues to suffer and will permanently suffer from nerve damage. Plaintiff was no longer able to be employed in the Head Drop position.

210.  Plaintiff was again demoted back to Pen Runner.

211.  The Hispanic supervisors continued to refer to their employees in Spanish by a racial designation "moyo".

212.  Plaintiff was denied over-time when at the end of his shift there may have been ancillary work to do which could have been awarded to African Americans but was only offered to Hispanics.

**Wrongful Termination**

213.    Plaintiff was terminated for a pretextual urine test which was dirty for *Cannabis*. Other similarly situated employees (non-African Americans) were not terminated for dirty *Cannabis* urines but were offered rehabilitation paid by JBS.  At the time of his termination, Plaintiff was earning $27.00 per hour.  Plaintiff was denied unemployment based upon intentional usage of *Cannabis*.

**Herbert L. Robinson's Individual Claims**

214.    Plaintiff Herbert L. Robinson, Sr. was employed at JBS from 2008 through December 24, 2021.

215.    In or about May 15, 2019, Plaintiff was employed as a Food Safety Supervisor earning about $54,000.00 per year plus benefits and upon severance from employment was earning $57,000.00.

**Disparate wages**

216.    Plaintiff was paid less than other similarly situates Supervisors who earned about $60,000.00-$75,000.00 per year.

**Hostile Work Environment**

217.    From May 15, 2019 through Plaintiff's severance of employment, Plaintiff

experienced a hostile work environment based upon race.

218.    During that time period, General Manager Scott Halderman routinely used the N--
- word and referred to Plaintiff as a N----.  When Plaintiff would shut the line off for
health concerns, Mr. Halderman said "N--- turn my line on".  This occurred numerous
times.

219.    On each occasion this occurred, Plaintiff complained to his Superintendent and
Tech Manager "Ami," but JBS did not investigate or remediate the hostile work
environment.

220.    Prior to May 15, 2019, and since approximately 2008, Plaintiff suffered a hostile
work environment.

221.    For example, in or about 2015, Howard Mercedes Tech Manager, for Food Safety
hung in a noose in his office threatening African American's employees.  Plaintiff was
disciplined by Mr. Mercedes in his office while the noose hung.   JBS management was
generally aware of Mr. Mercedes hanging the noose.  Plaintiff immediately complained
to Mr. Mercedes over a period of weeks who told Plaintiff he does as he pleases in his
office.  Plaintiff complained to Amanda Kelly HR.  The noose remained for days after
the complaint to HR.  The noose in all was hung for about a month.   From about 2014
through May 15, 2019, Mr. Mercedes routinely used N---- word and referred to Plaintiff
as a N---.  Plaintiff complained to Amanda Kelly, HR about Mr. Mercedes creating a
hostile work environment.  JBS did not investigate or remediate the conditions of
Plaintiff's employment.

**Failure to promote**

222.    In or about 2021, Plaintiff applied for an open Superintendent position in the

Slaughter Department which earned about $75,000.00-$85,000.00 per year.  Mr.

Halderman was the decision maker in hiring this position.  Mr. Halderman interviewed

Plaintiff. The successful candidate was less qualified for the position than Plaintiff.

Plaintiff was required to train the successful candidate.  The foregoing was retaliation

for making complaints about Mr. Halderman creating a hostile work environment.

223.        In or about 2021, Plaintiff applied for an open General Foreman position in the

Ground Beef Trim Line Department which paid about $85,000.00-per year.  Mr.

Halderman was the decision maker in hiring for this position. The successful candidate

was interviewed by Mr. Halderman. Plaintiff, through the course of his employment, had

experience as a Supervisor of Trim Line. JBS hired a less qualified Latino who had no

experience with the Trim Line.

## COUNT ONE:
## DISCRIMINATION AGAINST THE NAMED PLAINTIFFS
## AND
## THE CLASS IN VIOLATION OF SECTION 1981
## HOSTILE WORK ENVIRONMENT

224.        Plaintiffs repeat and re-allege each and every allegation above as if set forth herein

in full.

225.           Plaintiffs suffered intentional discrimination based upon race.

226.        The discrimination was severe or pervasive.

227.        The discrimination would detrimentally affect a reasonable person in like

circumstances.

228.        Defendant is responsible for the hostile work environment  under a theory of

respondeat superior.

**COUNT TWO:**
**DISCRIMINATION AGAINST THE NAMED PLAINTIFFS**
**AND**
**THE CLASS IN VIOLATION OF SECTION 1981**
**ADVERSE ACTION**

229.    Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

230.    Plaintiffs are in a protected class.

231.    Plaintiffs suffered adverse action including but not limited to: failure to hire; failure to promote; demotion; termination; constructive discharge; unequal pay or otherwise discriminated against the Plaintiffs and the Class in serious and tangible ways with respect to the Class's compensation, terms, conditions, or privileges of employment.

232.    Plaintiffs and the Class were qualified for and entitled to the same conditions of employment as those outside the protected class.

233.    Individuals outside the protected class were treated more favorably concerning the same conditions of employment.

234.    The discrimination which occurred gives rise to an inference of intentional discrimination.

235.    But for Plaintiffs' protected class status, they would have received the same conditions of employment as those outside the protected class -race was a determinative factor in Defendant's decisions.

236.    Plaintiffs are entitled to economic damages and for emotional distress as a result of the discrimination.

**COUNT THREE:**
**DISCRIMINATION AGAINST THE NAMED PLAINTIFFS**

**AND**
**THE CLASS IN VIOLATION OF SECTION 1981**
**RETALIATION**

237.    Plaintiffs repeat and re-allege each and every allegation above as if set forth herein

in full.

238.    Plaintiffs complained concerning the unlawful conduct described throughout the

Complaint.

239.    Plaintiffs were subjected to a materially adverse action at the time, or after, that

the protected conduct took place.

240.    There was a causal connection between adverse action as described in the

Complaint and Plaintiffs' complaints.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class respectfully request that this Court grant the following

relief:

a.    Certification of the Class;

b.    Enter a judgment declaring Defendant's acts and practices as set forth herein are in

violation of the laws of the United States;

c.    Enter preliminary and permanent relief enjoining the discriminatory conduct necessary to

end Defendant's discriminatory practices and prevent current and future harm to Plaintiffs

and the Class;

d.    Award Plaintiffs and the Class lost wages, including back pay, front pay and lost benefits,

and including, without limitation, any lost benefits that would otherwise have been

available to the Plaintiffs and Class without the discrimination;

e.   Award Plaintiffs and the Class compensatory for emotional distress

f.   Award Plaintiffs punitive damages;

g.   Award reinstatement to those Plaintiffs and Class members who prove discriminatory discharge;

h.   Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

i.   Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

**<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all issues of facts and damages in this action.

Dated:     April 22, 2024                    <u>*s/ William Riback*</u>, Esquire
                                             1101 N. Kings Highway, 210
                                             Cherry Hill, NJ 08034
                                             856.857.0008
                                             William.riback132@gmail.com

                                             Christopher Markos
                                             Gerald J. Williams
                                             Dylan Hastings
                                             WILLIAMS CEDAR
                                             1 South Broad Street, Suite 1510
                                             Philadelphia, PA 19107
                                             215-557-0009
                                             cmarkos@williamscedar.com
                                             gwilliams@williamscedar.com
                                             dhastings@williamscedar.com

## CERTIFICATE OF SERVICE

I, Christopher Markos, certify that the foregoing document was electronically filed via the Court's electronic filing system, where it is available for viewing and download by counsel for defendant.


Dated: <u>April 22, 2024</u>                    <u>*/s/ Christopher Markos*</u>
                                                Christopher Markos

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-02103-PAB-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

        Plaintiff,

and

IRAQ ABADE, et al.,

        Plaintiffs-Intervenors,

v.

JBS USA, LLC, d/b/a JBS SWIFT & COMPANY,

        Defendant.

---

## CONSENT DECREE

---

## I.    RECITALS

**1.**    This matter was instituted by Plaintiff Equal Employment Opportunity

Commission ("EEOC"), an agency of the United States government, alleging that

Defendant JBS USA, LLC, d/b/a JBS Swift & Company ("JBS"), violated Title VII of

the Civil Rights Act of 1964, as amended, by discriminating against Black, Somali, and

Muslim individuals by denying Muslim employees reasonable accommodations because

of religion, allowing race, ethnic, and religious harassment in the workplace, and

disciplining and discharging employees because of their national origin, religion, and/or

in retaliation for their requests for religious accommodation.

53295312.1

2.      The EEOC, JBS, and all individuals who have sought and received Court

approval to intervene ("Plaintiff Intervenors"), in the above-captioned matter

(collectively the "Parties"), desiring to settle this action by an appropriate Consent

Decree ("Decree"), agree to the jurisdiction of this Court over the Parties to the Decree

and the subject matter of this action, and they agree to the power of this Court to enter a

Consent Decree enforceable against JBS.

3.      The EEOC and JBS participated in the Court's Phase I trial on August 7, 2017,

through August 31, 2017. On October 30, 2018, the Court entered its Phase I Findings of

Fact and Conclusions of Law (ECF No. 620 "Phase I Findings"). The Phase I Findings

resolved the EEOC's Phase I claims in this case in JBS's favor and the court dismissed

those claims.

4.      As to the issues resolved herein, this Decree is final and binding upon the Parties

to the Decree and all successors and assigns. The EEOC, Plaintiff Intervenors, and JBS

jointly request this Court to adjudge as follows:

THEREFORE, upon the consent of the Parties to this Decree, and upon review by

the Court of these terms, it is ORDERED, ADJUDGED, and DECREED that the

following terms are approved as set forth herein:

## II.      JURISDICTION

5.      This Decree is made and entered into by and between the EEOC, JBS, and all

Plaintiff Intervenors in the above-captioned lawsuit.

6.      The EEOC, JBS, and Plaintiff Intervenors stipulate to the jurisdiction of the Court

over the Parties to this Decree and subject matter of this action and have waived the entry

of further findings of fact and conclusions of law.

7.      The term of this Decree and all obligations hereunder shall be two (2) years

("Term") from the date the Court signs, enters, and/or adopts this Decree (the "Effective

Date"). This Court shall retain jurisdiction of this matter for purposes of compliance,

final disposition of the claims of any Plaintiff Intervenor who cannot be located or fails to

respond, and any disputes that may arise hereunder.

### III.   ISSUES RESOLVED

8.      This Decree resolves all claims alleged in the above-captioned lawsuit, including

all claims asserted by the EEOC and the Plaintiff Intervenors, to include Phase I claims,

Phase II claims, and all claims encompassed in the Charges of Discrimination listed in

Attachment A and Attachment B (to be filed under Level 1 Restriction). This Decree

resolves all claims, all appeals, and all potential appeals.

9.      JBS, together with its officers, managers, and successors, will not interfere with

the relief set forth herein, but shall cooperate in the implementation of this Decree.

### IV.   MONETARY RELIEF

10.     Upon the conditions and terms set forth below, JBS agrees to pay up to

$5,500,000.00 ("Settlement Amount"), as payment to Eligible Participants (as defined

below) for alleged lost wages and benefits, compensatory damages, interest, attorneys'

fees, and costs. The Settlement Amount shall be deposited to a Qualified Settlement Fund

Account, to be established by the Settlement Administrator (as defined below), according

to the following schedule and terms:

(a)     Every three (3) months after the notice of settlement is mailed/emailed, the
        Settlement Administrator will provide a list to JBS, the EEOC, and
        Plaintiff Intervenors of all Eligible Participants who have executed and
        submitted a signed Waiver and Release Agreement (Attachment C) as of
        that date (a "Quarterly List"), along with notice of the total sum of that
        portion of the Settlement Amount allocated to such Eligible Participants,

plus the amount of associated employer payroll taxes due from JBS on
such amounts allocated to lost wages, together the "Quarterly Payment
Notice."

(b)    Within ten (10) business days after receiving each Quarterly List and
Quarterly Payment Notice from the Settlement Administrator, JBS will
submit a deposit ("Quarterly Deposit") in an amount corresponding to the
Quarterly Payment Notice to the Qualified Settlement Fund Account.

(c)    Within ten (10) business days after each Quarterly Deposit, the Settlement
Administrator will issue payments to all Eligible Participants appearing on
the corresponding Quarterly List.

(d)    The process described in paragraphs (a)-(c) above will repeat every 3
months from the date the initial notice of settlement is mailed or emailed
until the end of the Term.

(e)    The Settlement Administrator shall notify the Parties when 75% of
Plaintiff Intervenor Eligible Participants have returned a signed Waiver
and Release Agreement. Within ten (10) business days of such notification
from the Settlement Administrator, JBS shall submit the balance of the
$5,500,000 Settlement Amount to the Qualified Settlement Fund Account
("Final Deposit"). Should the Final Deposit become due prior to any of the
Quarterly Deposits, no further deposits will be due or owing by JBS other
than the Final Deposit.

(f)    Should less than 75% of Plaintiff Intervenor Eligible Participants return a
signed Waiver and Release Agreement during the Term, a Reduced Final
Deposit shall be paid, if necessary, after expiration of the Decree. The
Reduced Final Deposit will be calculated as the sum of amounts allocated,
per the Allocation List (defined below in Paragraph 18(a)), to all Eligible
Participants who returned a signed Waiver and Release Agreement during
the Term, plus the amount of associated payroll taxes due from JBS on
such amounts allocated to backpay, less the amount of all Quarterly
Deposits. After making the Reduced Final Deposit, if owed, under this
paragraph, JBS shall have no further obligation or liability whatsoever to
deposit any more amounts to the Qualified Settlement Fund Account.
Every Eligible Participant who returns a signed Waiver and Release
Agreement during the Term will be paid in full the amount allocated to
him or her on the Allocation List.

(g)    Notwithstanding (e) and (f), JBS agrees that, upon expiration of this
Decree, if more than 75% of Plaintiff Intervenor Eligible Participants have
returned a signed Waiver and Release Agreement at the end of the Term,
any undistributed balance of the Qualified Settlement Fund Account
remaining at the end of the Term will be disbursed at the sole discretion of

Page 4

the EEOC either (a) equally to Eligible Participants who previously returned a signed Waiver and Release Agreement and were sent a prior payment from the Settlement Amount, or (b) to a charity benefiting Somali refugees living in Colorado as designated by the EEOC.

11.     An "Eligible Participant" is (a) any individual who filed a charge of discrimination listed in Attachment A (which includes all charges used as the basis of the above-captioned lawsuit) or Attachment B (a list of all charges against JBS arising from the Greeley plant and pending with the EEOC as of March 25, 2021; ), (b) any individual identified by the EEOC as an aggrieved individual in the above-captioned lawsuit and listed in Attachment A, (c) any individual named as a Plaintiff Intervenor in the above-captioned lawsuit and listed in Attachment A, or (d) the estate of any Eligible Participant under (a), (b), or (c) who is deceased.

12.     The Settlement Amount includes attorneys' fees and costs, and no Eligible Participant receiving payment from the Settlement Amount will be entitled to receive any additional money for his or her attorneys' fees or costs.

13.     The EEOC, in its sole discretion, will determine how the Settlement Amount will be allocated among all Eligible Participants, and its allocation will be specified in the Allocation List as defined in Paragraph 18(a), below, and/or as specified in Paragraph 23 below, if needed. Allocation of the Settlement Amount among all Eligible Participants listed in Attachment A will be in an equal amount to be determined by the EEOC for damages, with such amount to be divided equally between backpay reportable on an IRS Form W-2 and other damages reportable on an IRS Form 1099-MISC, exclusive of separate allocation amounts for costs and attorneys' fees as applicable. Allocation of the Settlement Amount among Eligible Participants listed in Attachment B will be in an equal amount to be determined by the EEOC for damages, with such amount to be

divided equally between backpay reportable on an IRS Form W-2 and other damages

reportable on an IRS Formn1099-MISC, exclusive of separate allocation amounts for

costs and attorneys' fees as applicable. However, if an Eligible Participant is listed in

both Attachment A and Attachment B, such Eligible Participant will receive the

allocation listed in Attachment A only.

**14.**     Payments from the Qualified Settlement Fund Account will be made in

accordance with the Allocation List, as defined in Paragraph 18(a) below, and the terms

set forth in Paragraphs 10 and/or 22. Payments to Eligible Participants will be allocated

between backpay, reportable on an IRS Form W-2; other damages, including

compensatory damages, reportable on an IRS Form 1099-MISC, box 3; and, if

applicable, attorneys' fees and costs to those individuals represented by Plaintiff

Intervenors' Counsel, paid directly to the law firm and reportable on an IRS Form 1099-

MISC.

**15.**     JBS will not condition the receipt of individual relief upon an Eligible

Participant's agreement to: (a) maintain as confidential the terms of this Decree or the

facts of the case; (b) waive his or her statutory right to file a charge with any federal or

state anti-discrimination agency; or (c) refrain from reapplying for a position at any of

JBS's locations throughout the United States.

**16.**     In addition to the Settlement Amount specified in Paragraph 10 above, JBS shall

be responsible for paying the employer share of payroll taxes for payments from the

Qualified Settlement Fund allocated to backpay and reported on an IRS Form W-2.

**17.**     Within thirty (30) calendar days of the Effective Date of this Decree, JBS will

contract with a third-party settlement administrator, not employed by or associated with

JBS (the "Settlement Administrator"). All fees of the Settlement Administrator will be

paid by JBS, including fees and costs for all distributions. The Settlement Administrator

will be responsible for the following:

(a)  mailing to each Eligible Participant a Notice of Settlement drafted by the EEOC and/or Plaintiff Intervenors' counsel, and printed in both English and Somali languages;

(b)  using reasonable efforts to obtain updated addresses, telephone numbers, and/or email addresses for Eligible Participants as necessary and re-mailing or emailing any returned mail or returned email;

(c)  receiving, recording, and storing signed Waiver and Release Agreements, and completed IRS Forms W-9 for Plaintiff Intervenors' counsel and counsel representing any individual listed in Attachment B;

(d)  establishing a Qualified Settlement Fund Account into which JBS will deposit the Quarterly Deposits and Final Deposit or Reduced Final Deposit in accordance with the terms set forth in Paragraph 10, above;

(e)  issuing payments from the Qualified Settlement Fund Account to Eligible Participants who sign and return a Waiver and Release Agreement and their attorneys in accordance with the Allocation List and the terms set forth in Paragraphs 10 and/or 22;

(f)  prior to issuing any payment to an Eligible Participant, (i) receiving written approval from the Eligible Participant's counsel or the EEOC to issue payment, and (ii) verifying identity through receipt of copies of the Eligible Participant's government issued photo identification (such as a passport or driver's license) and social security number or Tax Identification Number (if known). For those Eligible Participants who have changed their names, the Settlement Administrator shall also require proof of their previous name and current legal name;

(g)  withholding taxes from any payment designated as backpay;

(h)  calculating the employer's share of payroll taxes and communicating to JBS the amount it owes for the employer's share of payroll taxes;

(i)  remitting all withheld taxes and employer payroll taxes to the appropriate tax authority;

(j)  issuing, preparing, and mailing to any Eligible Participant receiving payment all IRS Forms W-2 and 1099-MISC by January 31 of the

calendar year subsequent to payment from the Qualified Settlement Fund Account;

(k)    communicating as necessary with the EEOC's counsel, Plaintiff Intervenors' Counsel, and JBS's counsel;

(l)    tracking all necessary data regarding contact with individuals receiving payments from the Qualified Settlement Fund Account;

(m)    providing the EEOC's counsel, Plaintiff Intervenors' counsel, and JBS's counsel with a monthly report regarding the administration of the Qualified Settlement Fund, including the names of Eligible Participants who have submitted signed Waiver and Release Agreements, and for whom mail was returned and/or who otherwise have not made contact with the Settlement Administrator;

(n)    providing the EEOC's counsel, Plaintiff Intervenors' counsel, and JBS's counsel with a monthly report of the names of Eligible Participants who have not cashed their checks within thirty (30) days of checks being mailed;

(o)    establishing a telephone hotline which Eligible Participants may call and a website Eligible Participants may access to update the Settlement Administrator regarding his or her current contact information and submit signed Waiver and Release Forms;

(p)    obtaining necessary approval from the EEOC or the Eligible Participant's counsel, as required under Paragraph 17(f);

(q)    issuing the final distribution in conformance with Paragraph 10(g), above, after the end of the Term;

(r)    remailing to all Eligible Participants a Notice of Settlement if provided with a new address or email by the Eligible Participant, the EEOC, or Plaintiff Intervenors' counsel; and

(s)    engaging Somali translators as necessary to assist Eligible Participants who contact the Settlement Administrator.

**18.**    Within ninety (90) calendar days after the Effective Date, the EEOC and Plaintiff Intervenors' counsel will provide JBS's counsel and the Settlement Administrator the following documents:

(a)    A list of all Eligible Participants (the "Allocation List") in the form of an Excel spreadsheet, setting forth the name, Social Security Number or Tax

Identification Number (if known), last known mailing address, last known telephone number, last known email if available, whether the Eligible Participant is a Plaintiff Intervenor, amount due for backpay (reportable on an IRS Form W-2), amount due for other damages (reportable on an IRS Form 1099-MISC, Box 3); and amount due for attorneys' fees and costs (reportable on an IRS Form 1099-MISC). Once provided to JBS's counsel and the Settlement Administrator, the amounts due to each Eligible Participant for backpay, other damages, and attorneys' fees and costs as reflected in the Allocation List may not be altered or modified except as described in Paragraph 23.

(b)     A Notice of Settlement, printed in English and Somali, explaining the settlement and process for receiving payment from the Qualified Settlement Fund. The Notice will be prepared by Plaintiffs' counsel and provided to JBS's counsel and the Settlement Administrator for their input and suggestions.

19.     Within thirty (30) calendar days after receipt of the Allocation List, the Settlement Administrator will mail, and email if requested by the Eligible Participant, the EEOC, or Plaintiff Intervenors' counsel, the Notice of Settlement (in English and Somali) to each Eligible Participant on the Allocation List, together with a Waiver and Release Agreement (Attachment C, in English and Somali),  and a self-addressed return envelope, addressed to the Settlement Administrator. If emailed, no envelope will be provided but the Eligible Participant will be expected to make arrangements to have the necessary documentation provided to the Settlement Administrator directly or through his or her counsel. Between sixty (60) and ninety (90) days after the mailing/emailing of the Notice of Settlement, the Settlement Administrator will mail/email a reminder postcard to all Eligible Participants who have not submitted an executed Waiver and Release Agreement, with instructions and contact information for the Settlement Administrator (including the hotline telephone number and website).

**20.**     After approval under paragraph 17(f), each Eligible Participant who executes and submits a Waiver and Release Agreement will become entitled to payment from the Qualified Settlement Fund Account under the terms set forth in Paragraph 10, above. The Waiver and Release Agreement may be signed by a hand-written signature on a hard copy, or electronically through the website to be developed and maintained by the Settlement Administrator. The Eligible Participant shall have the option of receiving a paper check, having funds wired to his or her bank account, or having funds wired to a designated money transfer service . If the Eligible Participant opts for a paper check, the Eligible Participant may elect to have it mailed to a P.O. Box or alternative address or have it delivered to his or her counsel, if applicable. If funds are wired to a bank account or designated money transfer service, the Eligible Participant shall be responsible for all costs and fees charged by the sending or receiving bank or by the money transfer service associated with such transaction, which costs and fees will be deducted from the Eligible Participants' payment prior to distribution by the Settlement Administrator.

**21.**     If any mail sent to an Eligible Participant is returned as undeliverable, the Settlement Administrator will attempt to find an updated address or email address. If an updated address or email address can be found, the item will be re-mailed or emailed as set forth in Paragraph 17. If an updated address or email address cannot be found, the Settlement Administrator will provide the EEOC's counsel, Plaintiff Intervenors' counsel, and JBS's counsel with the name and any available contact information for the Eligible Participant. EEOC and Plaintiff Intervenors' counsel may then provide any updated mailing, email, or other contact information for Eligible Participants to the Settlement Administrator.

22.    At the end of the Term of this Decree, any remaining balance in the Qualified

Settlement Fund Account will be disbursed in the sole discretion of the EEOC, as

follows:  (a) as to all remaining amounts allocated to Eligible Participants on Attachment

A, the EEOC will determine to either (i) distribute such amounts equally to those Eligible

Participants on Attachment A who were previously sent payments from the Settlement

Fund, or (ii) donate such amounts to a charity benefiting Somali refugees living in

Colorado designated by the EEOC; and (b) as to any remaining amounts allocated to

Eligible Participants on Attachment B, such amounts will be donated to a charity

benefiting Somali refugees living in Colorado designated by the EEOC.

23.    As to any Eligible Participant on Attachment A who cannot be located or fails to

respond before the end of the Term, JBS will seek dismissal with prejudice of their

claims for failure to prosecute after the end of the Term. The EEOC and Plaintiff

Intervenors' counsel will not oppose such efforts. As to any Eligible Participant on

Attachment B who cannot be located or fails to respond before the end of the Term, the

EEOC will issue a Notice of Right to Sue to such individual. The EEOC further agrees

that it will take no further investigatory or enforcement action in relation to any charge

listed in Attachment B. As to all Eligible Participants on Attachments A or B who cannot

be located or fail to respond before the end of the Term, all counsel agree to comply with

their obligations under Formal Ethics Opinion 128 (Ethical Duties of Lawyer Who

Cannot Contact Client).

## V.    OTHER INDIVIDUAL RELIEF

24.    Within thirty (30) days after the Effective Date, JBS shall ensure that its records

reflect that individuals listed in the Allocation List are eligible for rehire. All inquiries by

any prospective employer shall be directed to The Work Number, 1-800-660-3399,

Employer Code 14950. Pursuant to JBS's standard practice, information provided by The

Work Number is limited to dates of employment.

## VI.   EQUITABLE RELIEF

**25.**   **Scope.**  The terms of this Decree shall apply to JBS's beef processing facility in

Greeley, Colorado.

**26.**   JBS, its officers, managers, and successors, will fully comply with all obligations

under Title VII, including without limitation: (a) using all reasonable, good faith efforts

to prevent and promptly correct any discriminatory, retaliatory, and/or harassing conduct

based on race, color, national origin, or religion; (b) providing Muslim employees

reasonable accommodations for their sincerely held religious beliefs and practices; and

(c) ensuring that Black, Somali, and Muslim employees are free from unlawful

discrimination and retaliation. JBS agrees it will not retaliate in any manner against

individuals identified as witnesses in this action, individuals who assisted in the

investigations giving rise to this action, or individuals who assisted in the investigation of

charges of discrimination otherwise resolved through this Decree.

**27.**   **Policy Review**

Within ninety (90) days after the Effective Date, JBS shall review its existing

EEO policies and other related policies, and revise them, if necessary, to conform with

the law and this Agreement. Upon completion of the policy review, any revised policies

shall be published to employees.

The written EEO policies must include at a minimum:

(a)      A strong and clear commitment to preventing unlawful race, color, national origin, or religious discrimination and retaliation.

(b)      A clear and simple definition of retaliation and discrimination (including harassment, disparate treatment, and denial of religious accommodation) based on race, color, national origin, and/or religion.

(c)      A statement that retaliation and discrimination based on race, color, national origin, or religion are prohibited and will not be tolerated.

(d)      A clear and simple definition of religious accommodation, to include examples of what is considered a religious accommodation, as well as a description of JBS's accommodation process. Such description should identify the appropriate individuals by position and/or title who are authorized to receive a request, either oral or written, for religious accommodation from the employee. If there are individuals in a different office, such as a centralized or home office, who handle religious accommodation requests, the person's name, position and/or title, and contact information, including telephone number, must be provided.

(e)      Specify the role of production managers and supervisors who may receive and process requests from employees for religious accommodation. The policy must provide guidance on how to process an oral or written request for religious accommodation, and the process must include the requesting employee's participation as appropriate to the particular request. This provision is intended to include requests for accommodation made during the hiring process.

(f)     A clear and strong encouragement of persons who believe they have been

         discriminated or retaliated against to report such concerns through

         appropriate channels.

(g)     The identification (including telephone numbers) of specific positions  to

         whom employees can report, orally or in writing, any allegations of

         discrimination, harassment, or retaliation.

(h)     An assurance that JBS will investigate oral and written allegations of

         unlawful discrimination promptly, fairly, reasonably, and effectively,

         using appropriate investigators; that JBS will create a record documenting

         any oral reports; that JBS will maintain documentation of all

         investigations and the results thereof; and that appropriate corrective

         action will be taken by JBS when warranted.

(i)      A description of the consequences, up to and including termination, that

         will be imposed upon violators of JBS's anti-discrimination policies.

(j)      A promise of maximum feasible confidentiality for persons who report

         unlawful discrimination, harassment, and/or retaliation, or who participate

         in an investigation into allegations of discrimination, harassment and/or

         retaliation.

(k)     An assurance of no retaliation against persons who report unlawful

         discrimination, harassment and/or retaliation, or who provide information

         as witnesses to or regarding allegations of unlawful discrimination,

         harassment or retaliation.

    (l)     Translation of all EEO policies into any language used as a primary language by more than twenty percent (20%) of JBS's production employees at the facility.

    (m)    Interpreter services will continue to be made available upon request for those who are not a large enough portion of the production workforce to be provided policy translations.

**28.**    **Communication**

    (a)     For any employee whose primary language is not English, JBS agrees to continue to provide translators upon request for trainings, disciplinary meetings, and any meetings concerning requests for religious accommodations, or complaints of discrimination or retaliation.

    (b)     JBS agrees to maintain its 24-hour "Ethics Line" hotline for receiving reports of discrimination, electronically or by telephone, and will identify a specific agent or hierarchy of agents who are to receive, document, and investigate complaints received through the hotline.

    (c)     The EEO policies shall be posted at JBS's Greeley, Colorado facility, in locations frequented by employees, including outside of the Human Resource offices and in the access tunnel. Any policies revised under Paragraph 27 ("Policy Review") shall be distributed to each current employee within 120 days after the Effective Date of this Decree. These policies, once revised, shall be distributed to all new employees when hired. JBS shall make these written policies available in alternative formats including but not limited to translations into languages used as a

primary language by twenty percent (20%) or more of JBS's production

employee population at the facility.

**29.    Investigation and Resolution of Employee Complaints**

JBS agrees that it is committed to the prompt, fair, reasonable, and effective

investigation of employee complaints of discrimination (including complaints of

harassment, retaliation, or denial of religious accommodation). JBS shall take immediate

appropriate corrective action when warranted, and will use its best efforts to eradicate

discrimination.

**30.    Training**

For a period of at least two years from the Effective Date of this Decree, JBS shall

continue to provide EEO training for all its employees. Under this provision, employees

will be trained at a minimum in the following areas: (a) JBS's policy and procedures for

reporting alleged discrimination; (b) understanding the kind of conduct which may

constitute unlawful discrimination or harassment; (c) the penalties for engaging in

discriminatory behavior; (d) JBS's non-retaliation policy; and (d) JBS's procedures for

handling accommodation requests. Training under this Paragraph may include JBS's

existing EEO training programs. The training will be conducted as follows:

(a)    <u>Non-Managerial Employees:</u>  JBS will provide non-managerial employees

at least 30 minutes of training annually, through each employee's required

annual computer-based training plan. Training will include the following

topics:  discrimination, including religious discrimination, an employer's

duty to reasonably accommodate an employee's sincerely held religious

beliefs, and procedures for requesting religious accommodation, hostile

work environment, and the process for reporting perceived discrimination or harassment.

(b)   <u>Managerial and Supervisory Employees</u>:  JBS will require all supervisors and managers to receive at least one (1) hour of training annually, through each employee's required annual computer-based training plan, regarding Title VII and other federal anti-discrimination laws. Thirty minutes of the training must directly address religious accommodation and discrimination; hostile work environment; and race, color, and national origin discrimination.  Additionally, JBS will require employees newly hired or promoted into a managerial or supervisory position to complete the requisite thirty minutes of race, color, national origin, hostile work environment, and religious discrimination training within thirty (30) days of being hired or promoted. JBS shall further designate a portion of training for the instruction of managerial and supervisory employees in the proper methods of receiving, handling, and investigating (where applicable) allegations of discrimination. JBS shall emphasize with managerial and supervisory employees that, because of their position of power, such employees must be particularly vigilant not to discriminate, either consciously or because they rely on subconscious stereotypes; that they must be sensitive to how their actions or words might be perceived by subordinate employees; and that they must avoid the temptation to retaliate if a complaint is made, or might be made, against them.

(c)   <u>First-Level Managerial and Supervisory Employees:</u> In addition to the one

(1) hour of EEO training provided under the prior paragraph, as part of all

training for first-level managerial and supervisory employees, they shall

be advised of their responsibilities as JBS managers and supervisors to

prevent workplace discrimination, including but not limited to how to

identify potential race, color, national origin, or religious discrimination,

as well as their obligations to refer requests for religious accommodation

and/or reports about potential discrimination to the appropriate person or

department within JBS's organizational structure.  At least a portion of

this training will focus on religious accommodation.

(d)   <u>Human Resource Employees:</u>  JBS will require all individuals who work

in an exempt human resource capacity to receive at least two (2) hours of

training annually regarding Title VII and other federal anti-discrimination

laws. One (1) of the two (2) hours must directly address religious

discrimination and accommodation. Additionally, JBS will require

employees newly hired or promoted into a human resource position to

complete one (1) hour of general EEO training within sixty (60) days of

being hired or promoted into a human resource position. JBS shall further

designate at least one (1) hour of training to the instruction of human

resources employees in the proper methods of receiving, handling, and

investigating (where applicable) allegations of discrimination, including

the proper procedures for documenting and preserving evidence, archiving

the company's investigation of complaints; appropriate methods for

ameliorating discrimination and documenting any remedial measures taken. If the human resources employee is a person who JBS has named as an agent for receiving, responding to, or investigating complaints of discrimination, in addition to the two (2) hours of general EEO trainings required by this paragraph, JBS shall designate an additional one (1) hour of training annually on instructing the employee in accepted professional standards for receiving and investigating complaints of discrimination, whether oral or in writing, and for eliminating and ameliorating violations of anti-discrimination law.

(e)   <u>Training the Trainers:</u>  Management or Human Resources employees who are designated by JBS as trainers will be provided at least one (1) additional hour of training on the subjects of the training and the proper methods of delivering the training.

JBS agrees that the first such training session for each employee group identified above will take place within one hundred eighty (180) days after the Effective Date of this Decree. JBS agrees it shall use its best efforts to ensure that all personnel attend the appropriate training sessions.

**31.   Religious Accommodations**

JBS shall continue to provide one or more clean, quiet, and appropriate locations other than a bathroom for its employees to use for observation of their religious tenets, such as daily prayers. Employees may also continue to use locker rooms or any other non-production location within the facility that does not pose a safety risk, for observation of their religious practices.

Consistent with current guidelines, employees may utilize approved unscheduled breaks to pray. Requests for prayer breaks shall be handled in accordance with current guidelines for unscheduled breaks.

Nothing in this agreement precludes requests for other forms of religious accommodation. JBS shall consider all individual employee requests for religious accommodation, and such requests will be addressed through an interactive process to identify an appropriate accommodation that does not impose an undue hardship on JBS's operations.

**32.    Diversity Committee**

In accordance with terms of the applicable collective bargaining agreement, JBS will continue its support of the existing Diversity Committee. JBS agrees to provide information about and promotion of the existing Diversity Committee to the workforce in English, Somali, Spanish and other languages used as a primary language by twenty percent (20%) or more of the production employee population of the facility.

**33.    Notice Posting**

Within five (5) business days after the Effective Date of this Decree, JBS shall post in English, Somali, Spanish and other languages used as a primary language by twenty percent (20%) or more of the production employee population at the facility the Notice attached as Attachment D to this Decree. The Notice shall be posted in areas frequented by production employees, including outside of the HR offices and in the entry tunnel. The Notice shall be the same type and style as set forth in Attachment D.  The Notice shall remain posted for a period of one (1) year. If the Notice becomes defaced or

Page 20

illegible, JBS will replace it with a clean copy within five (5) business days of the

discovery or reporting of the defacement or illegibility.

## VII.   REPORTING

**34.**      Within thirty (30) calendar days after the Effective Date, JBS will report to the

EEOC that the notice has been posted, as required under Paragraph 33.

**35.**      Within 120 calendar days after the Effective Date, JBS will report to the EEOC

that the notice remains posted, as required under Paragraph 33, and that the policy review

and distribution required under Paragraph 27, have been completed.

**36.**      JBS will submit two annual reports to the EEOC detailing the training sessions

conducted under Paragraph 30 during the reporting periods. Each report shall be due

within thirty (30) days after completion of the one-year reporting period.

## VIII.   ENFORCEMENT OF DECREE

**37.**      If the EEOC believes that Defendant has violated any provision of the Decree,

before filing an enforcement action, the EEOC will engage in informal efforts to resolve

the alleged violation. All communications under this provision will be via electronic mail,

served on counsel for the Parties at the email addresses reflected below.

## IX.   EEOC AUTHORITY

**38.**      With respect to matters or charges outside the scope of this Decree, this Decree

shall in no way limit the powers of the Commission to seek to eliminate employment

practices or acts made unlawful by any of the statutes over which the EEOC has

enforcement authority, and do not arise out of the claims asserted in the lawsuit, or any

Charge of Discrimination listed in Attachments A and B.

## X.    COSTS AND ATTORNEYS' FEES

**39.**    Each party shall be responsible for and shall pay his, her, or its own costs and

attorneys' fees.

## XI.    NOTICE

**40.**    Unless otherwise indicated, any notice, report, or communication required under

the provisions of this Decree shall be sent via email as follows:

Nathan Foster                                 Heather Fox Vickles, Esq.
Senior Trial Attorney                         SHERMAN & HOWARD, LLC
EEOC DENVER FIELD OFFICE                      hvickles@shermanhoward.com
nathan.foster@eeoc.gov                        Counsel for JBS USA, LLC

Diane King, Esq.
KING GREISEN, LLC
king@kinggreisen.com

Todd McNamara, Esq.
18TH AVENUE LAW, LLC
tjm@18thavelaw.com

David Lichtenstein, Esq.
LAW OFFICE OF DAVID LICHTENSTEIN, LLC
dave@lichtensteinlaw.com

James Chiu
LAW OFFICE OF JAMES CHIU
james@chiulawoffice.com

## XII.    SIGNATURES

The Parties to this Decree agree to the entry of this Decree subject to final

approval by the Court.

SO ORDERED this __8th__ day of ___June_____, 2021.

BY THE COURT:

_____
Honorable Philip A. Brimmer

**BY CONSENT:**

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

By: _Mary O'Neill_
    Mary Jo O'Neill
    Regional Attorney

Date: _____

JBS USA, LLC D/B/A JBS SWIFT &
COMPANY

By: _____
Tim Schellpeper
President, JBS USA Fed Beef Division

Date: 5.18.2021

The Parties agree that the below signatures of counsel representing the various Plaintiff-
Intervenors, as reflected in Attachment A and some Charging Parties in Attachment B, is
sufficient for execution of this Agreement.

_____
Diane King
KING GREISEN, LLC

Date: 05/19/2021

_____
David Lichtenstein, Esq.
LAW OFFICE OF DAVID LICHTENSTEIN

Date: 5-19-2021

_____
Todd McNamara, Esq.
18TH AVENUE LAW, LLC

Date: May 19, 2021

_____
James Chiu
LAW OFFICE OF JAMES CHIU

Date: 5/19/21

APPROVED AS TO FORM:

Nathan Foster
Trial Attorney
EEOC DENVER FIELD OFFICE
950 17th St., Suite 300
Denver, CO 80202

Attorney for Plaintiff EEOC

Heather Fox Vickles, Esq.
SHERMAN & HOWARD, LLC
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202

Attorney for Defendant JBS

Counsel representing Plaintiff-Intervenors as listed on Attachments A and B:

Diane King
KING GREISEN, LLC
1670 York Street
Denver, CO 80206

David Lichtenstein, Esq.
LAW OFFICE OF DAVID LICHTENSTEIN, LLC
1556 Williams St., Suite 100
Denver, CO 80218-1661

Todd McNamara, Esq.
18TH AVENUE LAW, LLC
1888 Sherman Street, Suite 370
Denver, CO 80218

James Chiu
LAW OFFICE OF JAMES CHIU
1776 Vine Street
Denver, CO 80206

Page 24

**ATTACHMENT A**

**(A List of All Individuals who filed Charges of Discrimination Giving Rise to the Litigation,
all named aggrieved individuals, and all named Plaintiff Intervenors)**

# ATTACHMENT B

**[A List of the Charges pending with the EEOC as of March 25, 2021 and Commissioner's
Charge No 541-2008-03274, – to be Filed under Level 1 Restriction]**

**ATTACHMENT C**

**Waiver and Release Agreement**

In consideration for at least $_____ paid to me by JBS USA, LLC, in connection

with the resolution of the lawsuit captioned *EEOC v. JBS USA, LLC d/b/a JBS Swift & Co,* Case

No. 10-cv-02103-PAB-KLM filed in the U.S. District Court for the District of Colorado ("EEOC

Lawsuit"), I, _____, [INSERT NAME AND ALL A/K/A'S AS REFLECTED IN

ATTACHMENTS A AND B] waive my right to recover for any and all claims asserted in the

EEOC Lawsuit, [and any and all claims asserted, or which could have been asserted, in my

EEOC Charge No. _____], and arising prior to the date of this Agreement,

against JBS USA, LLC or any of its parent, subsidiary, or associated entities as well as their

respective successors, assigns, officers, directors, employees, and agents.


Date: _____


Printed Name: _____


Signature: _____

## ATTACHMENT D

## NOTICE

The following notice is being posted pursuant to the terms of the Consent Decree reached between the Parties in *EEOC et al. v. JBS USA. LLC d/b/a JBS Swift & Company* filed in the United States District Court for the District of Colorado, Civil Action No. 10-cv-02103-PAB-KLM.

Management of JBS Swift & Company wishes to emphasize the company's fundamental policy of providing equal employment opportunity in all of its operation and in all areas of employment practices. JBS Swift seeks to ensure that there shall be no discrimination against any employee or applicant for employment on the grounds of race, color, religion, sex, pregnancy, national origin, age or disability. This policy extends to insurance benefits and all other terms, conditions and privileges of employment.

Pursuant to Title VII, it is unlawful for an employer to discriminate based upon the religion, color, race, or national origin of an applicant or employee. Further, it is unlawful for any employer to retaliate against an employee because he or she has requested reasonable accommodation for religion, opposed discriminatory employment practices, or because he or she has filed a charge of discrimination with any municipal, state or federal equal employment opportunity agency, or because he or she has participated in an investigation of a charge of discrimination.

JBS respects the right of its employees and applicants for employment to work in an environment free from discrimination. Accordingly, JBS reaffirms its commitment to complying with the strictures of Title VII, in that it is our policy to prohibit all discrimination based on religion, color, race, or national origin.

Any employee who believes that he/she has suffered discrimination on the basis of age, race, color, religion, sex, pregnancy, national origin, or disability, has the right to contact the EEOC directly at 1-800-669-4000 and/or the Colorado Civil Rights Division at (303) 894-2997. In compliance with federal law, no official at JBS will retaliate against an employee who makes an internal complaint of discrimination or who contacts the EEOC or its state counterpart.

This Notice shall remain posted for the term of one (1) year.

JBS USA, LLC d/b/a JBS Swift & Company

By: _____

Date: _____

# EXHIBIT B

**U.S. Department of Labor**

Office of Administrative Law Judges
5100 Village Walk, Suite 200
Covington, LA 70433

(985) 809-5173
(985) 893-7351 (Fax)

**Issue Date: 14 November 2018**

CASE NOS.:  2015-OFC-00001
             2017-OFC-00002

IN THE MATTER OF

**OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,**

        **Plaintiff**

  **v.**

**JBS USA LUX S.A. and SWIFT BEEF COMPANY
d/b/a JBS and JBS USA, f/k/a JBS USA, LLC,
JBS USA, Inc., and Swift & Co.**

        **Defendants**

# CONSENT DECREE AND ORDER

Plaintiff, Office of Federal Contract Compliance Programs, United States Department of

Labor ("OFCCP") and Defendant JBS USA LUX, S.A. and SWIFT BEEF COMPANY d/b/a JBS

and JBS USA, f/k/a JBS USA, LLC, JBS USA, Inc., and Swift & Co. ("JBS Hyrum") and JBS

USA LUX S.A. f/k/a JBS USA, LLC, JBS USA, INC., and SWIFT & CO., and SWIFT BEEF

COMPANY collectively d/b/a JBS and JBS USA ("JBS Cactus") have negotiated and executed

this Consent Decree and Order which resolves two separate matters.  Without admitting to any of

the alleged violations set forth in the Administrative Complaints filed in Case No. 2015-OFC-

00001 and Case No. 2017-OFC-00002 (collectively referred to as "Administrative Complaints"),

JBS Hyrum and JBS Cactus (collectively referred to as "JBS") agree, pursuant to 41 C.F.R. 60-

30.13, to the entry of this Consent Decree and Order ("Decree").  This Decree constitutes a complete and final settlement of these two matters.

## I.    JURISDICTION AND PROCEDURAL HISTORY

1.    This proceeding is authorized by Sections 208 and 209 of Executive Order 11246, as amended, and its implementing regulations at 41 C.F.R. Part 60-1, *et. seq.* and 41 C.F.R. Part 60-30.

2.    Defendant JBS Hyrum owns and operates a beef processing and packing establishment at 410 North 200 West, Hyrum, Utah, 84319 (the "Hyrum establishment").

3.    Defendant JBS Cactus owns and operates a beef processing and packing establishment at U.S. Highway 287, 5950 Trail End Road, Cactus, Texas 79013 (the "Cactus establishment").

4.    JBS Hyrum and JBS Cactus have, and at all relevant times have each had, 50 or more employees and one or more federal contracts with a value in excess of $50,000.00.

5.    JBS Hyrum and JBS Cactus have been federal government contractors within the meaning of Executive Order 11246, as amended, and are now, and at all relevant times have been, subject to the contractual obligations imposed on federal contractors by Executive Order 11246 and its implementing regulations.

6.    The issues resolved by this Decree involving the JBS Hyrum establishment were initially identified during OFCCP's compliance evaluation. OFCCP notified JBS Hyrum of the compliance evaluation of the JBS Hyrum establishment by scheduling letter dated August 3, 2007. On November 30, 2012, OFCCP issued JBS Hyrum an Amended Notice to Show Cause alleging that  the hiring practices at JBS Hyrum  resulted in discrimination against female

applicants[1] from August 6, 2005 through September 30, 2006 and against white, African-American and Native-American applicants from February 1, 2008 through June 30, 2009, who applied for Job Group 8A General Production/Laborer positions, and that JBS Hyrum failed to conduct adverse impact analyses in accordance with the requirements of 41 C.F.R. 60-3.15A and 60-3.4.

7.    OFCCP's Administrative Complaint in Case No. 2015-OFC-00001 alleges that JBS Hyrum discriminated against female applicants for Job Group 8A General Production/Laborer positions at JBS Hyrum from at least August 6, 2005 to at least September 30, 2006 and from at least January 1, 2009 to at least July 31, 2013, and against white, African-American, and Native-American applicants from February 1, 2008 to at least June 30, 2009, who applied for Job Group 8A General Production/Laborer positions at the JBS Hyrum establishment.

8.    The issues resolved by this Decree involving the JBS Cactus establishment were initially identified during OFCCP's follow-up compliance evaluation. OFCCP notified JBS's Cactus establishment of the follow-up evaluation by letter dated October 15, 2009. On March 22, 2016, OFCCP issued JBS's Cactus establishment an Amended Notice to Show Cause alleging that the hiring practices at JBS Cactus from September 26, 2007 through June 30, 2010 resulted in discrimination against black, Hispanic, Native American and white applicants applying for Job Group 8A General Production/Laborer positions, and that JBS Cactus failed to conduct adverse impact analyses in accordance with the requirements of 41 C.F.R. 60-3.15A and 60-3.4.

---

[1] The term "applicant" in this Agreement refers to those persons who have expressed interest in working for JBS in open positions at either JBS Hyrum or JBS Cactus. The use of the term "applicant" in this Agreement is not the same as the Internet Applicant definition set forth in 41 C.F.R. 60-1.3.

9.      OFCCP's Administrative Complaint in Case No. 2017-OFC-00002 alleges that JBS Cactus discriminated against black, Hispanic, American Indian/Alaska Native and white applicants for Job Group 8A General Production/Laborer positions at JBS Cactus from April 1, 2009 through December 31, 2016, and discriminated against female applicants on the basis of their gender for Job Group 8A General Production/Laborer positions at the JBS Cactus establishment from January 1, 2010 through December 31, 2016.

10.     The parties filed a Joint Motion to Consolidate Case No. 2015-OFC-00001 and Case No. 2017-OFC-00002 and for Entry of this Consent Decree. The above-captioned actions are consolidated for entry of this Consent Decree into one action pursuant to 41 C.F.R. § 60-30.8, 29 C.F.R. § 18.43 and Rule 42(a) of the Federal Rules of Civil Procedure. The instant actions shall be referred to as the "Consolidated Action."

## II.    GENERAL PROVISIONS

11.     This Decree constitutes full and final settlement and resolution of all issues, actions, causes of action and claims arising out of the Administrative Complaints and this Consolidated Action. This Decree shall be binding upon the parties as to all issues, actions, causes of action and claims that were brought or could have been brought within the scope of the Administrative Complaints and this Consolidated Action.  This Decree shall constitute the final Administrative Order in these cases and shall have the same force and effect as an order made after a full hearing and final review by the Administrative Review Board.

12.     This Consent Decree does not constitute an admission by JBS Hyrum or JBS Cactus of any violation of Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973 ("Section 503"), as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended ("VEVRAA"), or other laws, implementing regulations, or other

- 4 -

federal contractor obligations enforced by OFCCP, nor has there been an adjudicated finding that JBS Hyrum and/or JBS Cactus violated any laws, implementing regulations, or other federal contractor obligations enforced by OFCCP.

13.     The parties agree that this Consent Decree shall not create any rights of action in any third parties, nor shall it be offered in evidence or otherwise used in any manner by any person, firm, corporation, entity, organization, or agency of any government in any attempt to prove that JBS Hyrum and/or JBS Cactus has violated any law, regulation, or order, except for proceedings initiated to enforce the provisions of this Consent Decree.

14.     Subject to the performance by JBS Hyrum and JBS Cactus of all duties and obligations contained in this Decree, all alleged deficiencies identified in the Administrative Complaints and Consolidated Action shall be deemed fully resolved.

15.     Nothing herein is intended to relieve JBS from compliance with the requirements of Executive Order 11246 and/or 41 C.F.R. Part 60. Compliance with this Decree shall constitute compliance only with respect to those issues which are within the scope of this Decree.

16.     The Effective Date of this Decree shall be the date on which this Decree is signed by the Administrative Law Judge.

17.     JBS Hyrum and JBS Cactus agree that there will be no retaliation of any kind against any beneficiary of this Decree, or against any person who has provided information or assistance, or who files a complaint or participates in any manner in any proceeding against JBS under Executive Order 11246. JBS Hyrum and JBS Cactus also agree to abide by all applicable laws regarding retaliation against any beneficiary of this Decree, or against any person who either has provided information or assistance to OFCCP (or its agents, servants or employees) during the course of this litigation.

18.    Each party agrees to pay its own fees, costs, and other expenses incurred at any stage of these proceedings.

19.    All references to "days" in this Agreement are to calendar days.  If any deadline for an obligation to be performed falls on a weekend or federal holiday, the deadline shall be extended to the next business day.

### III.    <u>SPECIFIC PROVISIONS</u>

20.    For purposes of this Decree, the affected class members are female, white (other than Hispanic), and American Indian/Alaska Native applicants who applied for Job Group 8A General Production/Laborer positions at JBS's Hyrum establishment from August 6, 2005 through February 28, 2016 who were not hired ("JBS Hyrum Class Members") and female, white (other than Hispanic), American Indian/ Alaska Native, and African-American/black applicants who applied for Job Group 8A General Production/Laborer positions at JBS's Cactus establishment from September 7, 2007 through December 31, 2012 who were not hired ("JBS Cactus Class Members"). The JBS Hyrum Class Members and JBS Cactus Class Members (collectively "Class Members") are identified on Attachments A1 and A2.  (Excluded from service of the instant Consent Decree).

### A.  <u>Notification</u>

21.    JBS shall notify the Class Members of this settlement within forty-five (45) days of the Effective Date of this Decree by mailing to each Class Member via first class mail a Notice Form explaining the settlement ("Notice," Attachments B1 and B2); a Claim Form ("Claim Form," Attachments C1 and C2); a Release of Claims Under Executive Order 11246 ("Release," Attachments D1 and D2); and a self-addressed stamped envelope.

22.     Each Class Member listed on Attachments A1 and A2 (or the Class Member's appointed legal representative in the event that he or she is deceased or as otherwise provided under the law) shall be given forty-five (45) days from the postmarked date of the Notice to respond by returning the completed Claim Form and executed Release to JBS's settlement administrator.  Any response delivered or postmarked by the 45th day following the date of receipt of the Notice shall be considered to have been submitted within the 45-day period.

23.     On a bi-weekly basis, JBS will notify OFCCP of all letters returned as undeliverable. Within one hundred ten (110) days of the Effective Date of this Decree, JBS shall provide OFCCP with a list of Class Members who did not timely and fully respond to the Notices.  Within fifteen (15) days of receiving the list from JBS, OFCCP shall conduct a search to attempt to locate the Class Members whose letters were returned as undeliverable or who did not respond.  For all Class Members that OFCCP locates, JBS shall send another applicable Notice, Claim Form, Release and self-addressed stamped envelope within fifteen (15) days of receiving the Class Member's address from OFCCP.  Each such Class Member shall be given forty-five (45) days from the postmarked date of the second Notice to respond by returning the completed Claim Form and executed Release to JBS's settlement administrator.

24.     Within two hundred (200) days of the Effective Date of this Decree, JBS shall provide to OFCCP a list of all JBS Hyrum Class Members and a list of all JBS Cactus Class Members who timely submitted a completed Claim Form and executed Release along with electronic copies of all Claim Forms and Releases that were returned to JBS. Within two hundred and ten (210) days of the Effective Date of this Decree, OFCCP shall approve the list of JBS Hyrum Class Members and the list of JBS Cactus Class Members who have timely

responded to the first or second Notice, or work with JBS to revise the lists so that they can be approved by OFCCP. The approved list of JBS Hyrum Class Members shall constitute the "Final JBS Hyrum List" and the approved list of JBS Cactus Class Members shall constitute the "Final JBS Cactus List." If a Class Member is not located and/or does not return a completed Claim Form and executed Release within one hundred and eighty (180) days of the Effective Date of this Decree, the Class Member will no longer be entitled to any relief pursuant to this Decree. Persons identified on the JBS Hyrum Final List shall be referred to as "Eligible JBS Hyrum Class Members" and persons identified on the JBS Cactus Final List shall be referred to as "Eligible JBS Cactus Class Members" (collectively "Eligible Class Members").

25.     OFCCP and JBS agree that JBS shall have no further liability for back pay, interest, or any other relief under this Decree to any Class Member identified on Attachments A1 or A2 who cannot be located within the timeframes enumerated above or who does not complete and submit a completed Claim Form and executed Release within one hundred and eighty (180) days of the Effective Date of this Decree.

### B.  Monetary Settlement

26.     In settlement of all claims for back pay and interest to the Eligible Class Members, JBS Hyrum will pay ONE MILLION THREE HUNDRED TWENTY THOUSAND DOLLARS ($1,320,000.00) in back pay and interest to the Eligible Class Members, of which $1,016,400.00 is back pay and $303,600.00 is interest.  JBS Cactus will pay TWO MILLION SIX HUNDRED EIGHTY THOUSAND DOLLARS ($2,680,000.00) in back pay and interest to the Eligible Class Members, of which $2,063,600.00 is back pay and $616,400.00 is interest.  The total amount of $4,000,000.00 paid by JBS Hyrum and JBS Cactus (referred to as "the Back Pay Fund") is a

negotiated amount that represents back pay less mitigation, and takes into account the average tenure of those persons hired into Job Group 8A General Production/Laborer positions at the JBS Hyrum and JBS Cactus establishments during the relevant time period.

27.     Within two hundred thirty (230) days of the Effective Date of this Decree, JBS shall distribute the Back Pay Fund, less deductions required by law, equally among all Eligible Class Members, regardless of the facility at which an applicant originally applied or the class list on which the applicant appears in this Decree, by mailing a check to each Eligible Class Member representing his or her pro rata share of the total amount in the Back Pay Fund. Monetary relief is not contingent upon accepting a job offer.

28.     JBS shall make all legal deductions required by law (*i.e.*, normal federal, state and/or local taxes and FICA) from the portion representing back pay only, and shall pay to the Internal Revenue Service the employer's share of social security withholding attributable to the back pay portion of the Back Pay Fund. JBS will also mail a Form W-2 (representing the amount of back pay) and, as appropriate, a Form 1099 (representing the amount of interest) to each Eligible Class Member either with the check or consistent with JBS's business practices.

29.     Within ten (10) days of JBS's receipt of a returned check from an Eligible Class Member, JBS shall notify OFCCP of this fact via email. OFCCP will attempt to locate the Eligible Class Member and if OFCCP obtains an alternate address, JBS will re-mail the check. Any check that remains uncashed within one hundred twenty (120) days after the initial date mailed to an Eligible Class Member shall be void and shall not be reissued to that Class Member.

30.     With respect to any funds in the Back Pay Fund that remain undistributed after one hundred twenty (120) days from the date the checks were mailed, JBS shall make a second distribution to all Eligible Class Members who cashed their first check if the amount of the

- 9 -

uncashed funds would result in a payment of $50.00 or more to each of the located Eligible Class Members. If the total amount of uncashed funds would result in a payment of less than $50.00 to each located Eligible Class Member, JBS shall use those uncashed funds to provide training to managers on their obligations under the Executive Order.

31.     The parties may modify any time frame set forth in this Decree by mutual agreement. In addition, OFCCP or JBS may petition the Administrative Law Judge to extend any of the above time periods for no more than thirty (30) days in order to permit an Eligible Class Member to receive his or her share of the Back Pay Fund where the interest of justice would be served by such extension and for good cause shown.

C.   Hiring of Class Members

32.     As entry-level Job Group 8A General Production/Laborer positions become available at the JBS Hyrum establishment, JBS will extend written conditional job offers to qualified Eligible JBS Hyrum Class Members not currently employed by JBS or a JBS affiliate who: (1) timely return a completed Claim Form expressing interest in employment with JBS at the JBS Hyrum establishment as an entry-level Job Group 8A General Production/Laborer worker; (2) timely return a fully-executed Release in accordance with the instructions contained in the Notice; and (3) meet JBS's job requirements.[2]  Written conditional job offers shall be extended to Eligible JBS Hyrum Class Members who meet these requirements until the following number of Eligible JBS Hyrum Class Members have successfully completed the selection process and are hired into Job Group 8A General Production/Laborer positions at the

---

[2] The job requirements are: (1) complete an updated employment application; (2) be age 18 or over; (3) pass a drug test and post-offer medical evaluation; (4) be eligible to work in the United States; and (5) agree to accept wages, work hours, overtime, and shift requirements according to JBS Hyrum's or JBS Cactus's needs and assignments.

JBS Hyrum establishment, or until the list of Eligible Class Members expressing an interest in employment at the JBS Hyrum establishment is exhausted, whichever occurs first:

    a. Two Hundred Thirteen (213) female Eligible JBS Hyrum Class Members;

    b. Three Hundred Thirty Two (332) white (other than Hispanic) Eligible JBS Hyrum Class Members; and

    c. Twenty Four (24) American Indian/Alaska Native Eligible JBS Hyrum Class Members.

33.    As entry-level Job Group 8A General Production/Laborer positions become available at the JBS Cactus establishment, JBS will extend written conditional job offers to qualified Eligible JBS Cactus Class Members not currently employed by JBS or a JBS affiliate who: (1) timely return a completed Claim Form expressing interest in employment with JBS at the JBS Cactus establishment as an entry-level Job Group 8A General Production/Laborer worker; (2) timely return a fully-executed Release in accordance with the instructions contained in the Notice; and (3) meet JBS's job requirements (set forth in footnote 2 of this Consent Decree). Written conditional job offers shall be extended to Eligible JBS Cactus Class Members who meet these requirements until the following number of Eligible JBS Cactus Class Members have successfully completed the selection process and are hired into Job Group 8A General Production/Laborer positions, or until the list of Eligible JBS Cactus Class Members expressing an interest in employment at the JBS Cactus establishment is exhausted, whichever occurs first:

    a. Five Hundred Seventy Five (575) female Eligible JBS Cactus Class Members;

    b. Three Hundred Four (304) white (other than Hispanic) Eligible JBS Cactus Class Members;

    c.   Eight (8) American Indian/Alaska Native Eligible JBS Cactus Class Members; and

    d.   Two Hundred Eight (208) African-American/Black Eligible JBS Cactus Class Members.

34.     In satisfying the hiring obligation, if an Eligible Class Member is both a female and is in one of the race/ethnicity groups identified above for the establishment at issue, the hire may be counted against the both the gender and race/ethnicity obligation (*e.g.*, a white female hire can be counted as both a white hire and a female hire if she is on both hire lists). Eligible Class Members shall be considered in the order that JBS received their completed Claim Forms expressing an interest in employment at the JBS Hyrum or JBS Cactus establishments.  If Claim Forms are received on the same day, the earliest original application date of the Eligible Class Member will determine the order of employment consideration.

35.     JBS Hyrum and JBS Cactus will complete the hiring obligations under this Decree within twenty-four (24) months of the Effective Date of this Decree or when the list of Eligible Class Members expressing an interest is exhausted, whichever occurs first.

36.     Eligible Class Members shall be responsible for notifying JBS Hyrum and JBS Cactus of any changes in their addresses or other contact information.  Eligible Class Members will be allowed at least one week to accept a written conditional job offer and an additional two weeks to report to work after receiving a written conditional job offer from JBS.

## D.  Adverse Impact Analyses

37.     In accordance with 41 C.F.R. 60-3.4 and 3.15A, JBS's Hyrum and JBS Cactus establishments will maintain and have available for inspection adverse impact analyses, on at least an annual basis, for the purpose of determining whether adverse impact exists against

- 12 -

applicants based on race, sex, or national origin/ethnic group in hiring, promotion, termination, and other personnel activities. These analyses will be done by job for each group constituting more than 2% of the labor force in the relevant labor area or 2% of the applicable workforce. If adverse impact is identified in the total selection process, JBS Hyrum and JBS Cactus will evaluate each individual component of the selection process for adverse impact. If adverse impact is found to exist in any of the individual components of the selection process, JBS Hyrum and JBS Cactus will validate each such component in accordance with the Uniform Guidelines on Employee Selection Procedures or utilize selection procedures which do not result in adverse impact.

## IV.    REPORTING

38.    JBS's Hyrum and Cactus establishments will prepare and submit four (4) bi-annual Progress Reports. The reports shall be submitted to Melissa L. Speer (or her successor), Regional Director, Office of Federal Contract Compliance Programs, Southwest and Rocky Mountain Region, 525 S. Griffin Street, Room 840, Dallas, Texas, 75202 on the following dates: July 31, 2019, January 31, 2020, July 31, 2020, and February 1, 2021. These reports shall contain the following:

a.    Documentation of monetary benefits provided to each Eligible Class Member pursuant to the terms of this Decree, including for each: the name of the person receiving back pay and interest, the check number, the dollar amount of the check, the date of the check and the date the check was cashed. OFCCP may request copies of cancelled checks disbursed by JBS to Eligible Class Members or other equivalent documentation verifying that Eligible Class Members were paid.

b.  The names of all Eligible Class Members hired by each establishment, stating the establishment, the job hired into, starting rate of pay, and hire date.

c.  The names of all Eligible Class Members who refused a written conditional job offer, along with documentation showing the date of the offer and the person's refusal of such offer.

**d.**  For each Eligible Class Member who received and accepted a written conditional job offer but was not hired, the reasons for the non-selection and all documentation relating to that non-selection.

## V.    ENHANCED COMPLIANCE AGREEMENT

39.  JBS USA LUX, S.A. and SWIFT BEEF COMPANY d/b/a JBS, JBS USA, f/k/a JBS USA, LLC, JBS USA, Inc., and Swift & Co. and JBS USA LUX S.A. f/k/a JBS USA, LLC, JBS USA, INC., and SWIFT & CO., and SWIFT BEEF COMPANY ("JBS"), and Pilgrim's Pride Corporation ("PPC") consents to PPC's joinder as a party to the Consolidated Action and this Decree solely for purposes of this Section V.  For purposes of this Section V of the Decree, the parties will be collectively referred to as "JBS/PPC."

40.  To proactively facilitate compliance with Executive Order 11246, as amended, JBS/PPC will take the steps described below to enhance its compliance with Executive Order 11246 in the hiring of Job Group 8A General Production/Laborers at its facilities operating in the United States during the term of this Enhanced Compliance Agreement ("facilities").  The current facilities are identified on Attachment E.  The parties understand that the facilities subject to this Section V of the Consent Decree may change as JBS/PPC acquires or divests facilities which employ Job Group 8A General Production/Laborers .  However, JBS/PPC agrees it will provide the Regional Director of the Southwest and Rocky Mountain Region with written notice

of any such changes within thirty (30) days of the acquisition or sale. When JBS/PPC acquires a facility which employs Job Group 8A General Production/Laborers, the new facility will be covered under the terms of this Section V of the Consent Decree for the duration of the Five-Year Period, defined below. If a JBS/PPC facility governed by this Section V of the Consent Decree is divested to an unrelated third party, such facility will no longer be covered under this Section V of the Decree as of the effective date of the sale.

41.    JBS/PPC has retained a Human Resources Consultant ("Consultant") for the purpose of evaluating the policies and procedures related to the Job Group 8A General Production/Laborer hiring process, and OFCCP has concurred with that selection. The Consultant has relevant educational background and substantial experience in developing and implementing job-related and neutral employee selection processes.

42.    The Consultant will evaluate the policies and procedures JBS/PPC currently uses to hire Job Group 8A General Production/Laborers at all of its facilities. The Consultant will conduct on-site visits to the JBS Hyrum and JBS Cactus facilities, and will determine the number and location of other facilities the Consultant will visit in order to ensure a comprehensive and thorough evaluation of JBS/PPC's hiring policies and procedures for Job Group 8A General Production/Laborers. The sample size will be large enough to provide a high level of confidence that it is reflective of the practices across JBS/PPC as a whole.

43.    Within sixty (60) days after the Effective Date of this Enhanced Compliance Agreement, the Consultant will submit to JBS/PPC and OFCCP a proposal that describes the methodology used in the evaluation. The proposal will identify the facilities to be visited and will estimate the time necessary to conduct a comprehensive evaluation of JBS/PPC's Job Group 8A General Production/Laborer hiring practices and write a report containing the Consultant's

- 15 -

findings and recommendations.  The evaluation and recommendations will cover the following areas:

    a.    Procedures to recruit, screen, interview, select, reject, and hire Job Group 8A General Production/Laborers without regard to sex, sexual orientation, gender identity, race/ethnicity, color, national origin, and religion in compliance with Executive Order 11246.

    b.    Procedures to limit subjectivity in the hiring process, including identifying objective qualifications and criteria to be used to select and/or eliminate from further consideration persons expressing an interest in employment at each step of the hiring process (*i.e.*, application screen, interview,  post-offer screen, etc.).

    c.    Procedures to ensure that persons expressing an interest in employment are tracked and decisions are documented at each step in the hiring process.

    d.    Procedures to ensure that documents are retained in accordance with 41 C.F.R. 60-1.12(a) and Part 60-3.

    e.    Procedures to train all employees involved in the hiring process on the policies and practices related to JBS/PPC's selection of Job Group 8A General Production/Laborers.

    f.    Procedures to ensure that adverse impact analyses are conducted in accordance with 41 C.F.R. Part 60-3, including evaluating the individual components and qualifications if statistical disparities exist.

The proposal will also outline provisions for the Consultant's monitoring of the implementation and effectiveness of any of the Consultant's recommendations.  Upon receipt of the proposal, JBS/PPC and OFCCP will negotiate in good faith any amendments thereto.

44.     Within sixty (60) days after the Consultant concludes the evaluation, the Consultant will provide a written report ("Consultant's Report") to JBS/PPC and OFCCP containing findings and recommendations. The Consultant's Report shall include the following:

     a.     A description of the evaluation conducted by the Consultant.

     b.     A summary of the Consultant's findings regarding JBS/PPC's current policies, procedures and practices related to the hiring of Job Group 8A General Production/Laborers.

     c.     The Consultant's findings and recommendations regarding each of the items set forth in Paragraph 43 above, as well as any other items included in the Consultant's proposal.

     d.     Any additional recommended actions or revisions to the policies, procedures, and practices for Job Group 8A General Production/Laborers to ensure equal opportunity for all persons expressing an interest in employment.

     e.     Recommendations for training for all individuals involved in the hiring of Job Group 8A General Production/Laborers.

45.     At a mutually-agreeable date after receipt of the Consultant's Report, but as soon as reasonably possible, JBS/PPC, the Consultant, and OFCCP will meet to review the Consultant's Report in detail and to discuss and evaluate the Consultant's recommendations. If JBS/PPC or OFCCP disagrees with any of the recommendations, the parties will discuss the reasons for the disagreement and possible alternatives. After the parties agree to the scope and nature of the recommendations, if any, to be implemented, JBS/PPC will work with the Consultant, with input from OFCCP as requested, to fully implement such recommendations

within one hundred and eighty (180) days.  Should implementation of the agreed upon recommendations (or segments thereof) require more than one hundred and eighty (180 days), JBS/PPC and OFCCP will work together in good faith to establish reasonable timelines for implementation.

46.    JBS/PPC will, in consultation with the Consultant, develop and conduct a training program to be presented to all individuals involved in the Job Group 8A General Production/ Laborers hiring process (*i.e.*, recruiting, screening, interviewing, selection, rejection, and hiring) at all JBS facilities.  Individuals attending this training will include, at minimum, all human resources recruiters, managers, and directors; production supervisors; and corporate human resources and compliance personnel.  The training program will include instruction on the Consultant's recommendations that JBS/PPC agrees to implement.  The training will be mandatory for the personnel identified above, and any employees who are not able to attend the in-person training will be required to watch a videotape of the in-person training session. For a period of five years from the Effective Date of this Enhanced Compliance Agreement ("Five-Year Period"), all employees who have a role in in the hiring of Job Group 8A General Production/Laborers shall be required to attend either an in-person training, which is preferred and should be done periodically, or view the training videotape, within ninety (90) days after assuming such role.

47.    JBS/PPC, in consultation with the Consultant and/or additional resources, will monitor the implementation of and results achieved from the revised Job Group 8A General Production/Laborer hiring process, and will provide reports to OFCCP on at least a semi-annual basis for the Five-Year Period.  The monitoring reports will indicate whether the revised hiring process has been fully implemented and whether the individuals involved in the revised hiring

process are following the revised policies and procedures. The monitoring reports will also include appropriate recommendations, if any, to alter or change the revised hiring process, its implementation, or training, to ensure a nondiscriminatory hiring process.

48.　　During the Five-Year Period, JBS/PPC will conduct adverse impact analyses of Job Group 8A General Production/Laborer hiring at each of its facilities consistent with the requirements of 41 C.F.R. 60-3.4 and 3.15 on at least a semi-annual basis. If JBS/PPC finds statistically significant disparities in hiring Job Group 8A General Production/Laborers at any facility, JBS/PPC shall work with the Consultant to investigate the cause of the disparities and take appropriate action, such as providing refresher training or making additional changes to the hiring process. JBS/PPC is not required to provide the results of these specific adverse impact analyses to OFCCP for any of the facilities but may do so at its discretion.

49.　　During the Five-Year Period, JBS/PPC and OFCCP (and if appropriate, the Consultant) will meet once a year to discuss JBS/PPC's progress in implementing the adopted recommendations, to discuss concerns, and to continue to chart a path toward a mutually-beneficial partnership. The parties will jointly agree on the timing, location, and structure of the meeting to facilitate maximum exchange of ideas. Should the parties deem a meeting unnecessary, it can be waived by mutual agreement. Moreover, in recognition of the time necessary to fully implement the Consultant's recommendations, provide training to hiring managers and human resources staff, monitor the revised hiring process, and make additional changes or refinements to the revised hiring process that may be warranted, OFCCP agrees not to conduct any compliance evaluations of any JBS/PPC facility for the Five-Year Period, other than to investigate Complaints filed by applicants or employees under Executive Order 11246, as amended, Section 503 of the Rehabilitation Act, and VEVRAA.

50.     This Enhanced Compliance Agreement between JBS/PPC and OFCCP does not provide JBS/PPC with any grant of immunity or protection from its requirement to comply with Executive Order 11246.

51.     This Enhanced Compliance Agreement between JBS/PPC and OFCCP may be modified upon the written consent of the parties, and such consent will not be unreasonably withheld.

52.     This Enhanced Compliance Agreement is between OFCCP and JBS/PPC (as collectively defined above) and does not confer any rights or benefits to any other parties, other than any successor to, parent of, or subsidiary of JBS/PPC or OFCCP. In case of a disagreement over the implementation of this Enhanced Compliance Agreement, the parties agree to negotiate the disagreement in good faith prior to enforcement.

## VI.     IMPLEMENTATION AND ENFORCEMENT

53.     This Decree shall constitute the final administrative order in this case, and shall have the same force and effect as an order made after a full hearing and final review by the Administrative Review Board.

54.     The entire record upon which this Decree is based shall consist solely of the Administrative Complaints, this Decree, and Attachments A-E.

55.     The parties hereby waive any further procedural steps provided in 41 C.F.R. Part 60-30 for a final administrative order.

56.     The parties waive any right to challenge or contest the validity of the provisions of this Decree.

57.     The Office of Administrative Law Judges shall retain jurisdiction of this proceeding for the sole purpose of enforcing implementation of this Decree in accordance with

its terms. The Office of Administrative Law Judges shall retain jurisdiction of this case for a period of five (5) years following the Effective Date of the Decree, or until thirty (30) days after JBS satisfies it obligations described herein, whichever is later.

58.    OFCCP shall be solely responsible for initiating enforcement of compliance with the terms of the Consent Decree.

59.    JBS agrees that OFCCP may review compliance with this Consent Decree and will provide OFCCP with all documents reasonably related to such a review. JBS also agrees to allow OFCCP to come on site at either JBS Hyrum or JBS Cactus during normal business hours as is necessary to review compliance with this Decree and upon explaining the reason for doing so.  OFCCP agrees to coordinate with JBS any onsite visit to review compliance with this Consent Decree prior to coming on site.  If at any time during the term of this Decree OFCCP believes that JBS has violated any portion of this Consent Decree, OFCCP will promptly notify JBS in writing. This notification will include a statement of the facts and circumstances OFCCP relied upon in forming that belief. JBS will have fifteen (15) days in which to respond in writing to the allegations of violation, except in those circumstances in which OFCCP alleges that such a delay would result in irreparable injury.

60.    Enforcement proceedings for violation of this Consent Decree may be initiated at any time after the fifteen (15) day period has elapsed (or sooner if irreparable injury is alleged), upon filing with the Office of Administrative Law Judges a motion for an order of enforcement and/or sanctions. The Administrative Law Judge may, if he or she deems it appropriate, schedule an evidentiary hearing on the motion. The issues in a hearing on the motion shall relate solely to the issues of the factual and legal claims made in the motion.

61.     Liability for violation of this Decree may subject JBS and its successors, assigns, divisions or parents, affiliates and subsidiaries to the sanctions set forth in Executive Order 11246 and its implementing regulations, and other appropriate relief.

62.     If a motion for an order of enforcement or clarification made by OFCCP or JBS is unopposed, the motion may be presented to the Administrative Law Judge without a hearing, and the proposed order may be implemented immediately. If the application or motion of OFCCP or JBS is opposed by the other party, the party in opposition shall file a written response within fifteen (15) days of service of such motion.

The Consent Decree herein set forth is hereby **APPROVED** and shall constitute the final Administrative Order in these cases.

**ORDERED** this 14th day of November, 2018, at Covington, Louisiana.

LEE J. ROMERO, JR.
Administrative Law Judge